JOHNSON CONTROLS, INC., Plaintiff-Appellant-Petitioner,

v.

EMPLOYERS INSURANCE OF WAUSAU, a mutual company (f/n/a Employers Mutual Liability Insurance Company of Wisconsin), Affiliated FM Insurance Company, AIU Insurance Company, Allstate Insurance Company (as successor to Northbrook Excess and Surplus Insurance Company), American Employers' Insurance Company, American Home Assurance Company, American Motorists Insurance Company, Central National Insurance Company of Omaha, Employers Mutual Casualty Company, Employers Reinsurance Corporation, Federal Insurance Company, First State Insurance Company, Granite State Insurance Company, Highlands Insurance Company, Landmark Insurance Company, London Market (certain underwriters at Lloyd's London and London Market Insurance Companies), National Union Fire Insurance Company of Pittsburgh, PA, Northbrook Excess and Surplus Insurance Company (as predecessor to Allstate Insurance Company), Puritan Insurance Company (f/n/a Manhattan Fire and Marine Insurance Company), Stonewall Insurance Company, Transamerica Premier Insurance Company, Travelers Indemnity Company, United National Insurance Company, Zurich Insurance

Company, International Insurance Company, and Westchester Fire Insurance Company, Defendants-Respondents,

ALLIANZ UNDERWRITERS INSURANCE COMPANY, American Centennial Insurance Company, American Insurance Company, Associated International Insurance Company, California Union Insurance Company, Continental Insurance Company, Fireman's Fund Insurance Company, Harbor Insurance Company, North Star Reinsurance Corporation, and Republic Insurance Company, Defendants.

Supreme Court

*No. 01–1193. Oral argument October 8, 2002.—Decided July 11, 2003.*

2003 WI 108

(Also reported in 665 N.W.2d 257.)

63

For plaintiff-appellant-petitioner there were briefs by *Matthew J. Flynn, Jeffrey O. Davis, Rachel A. Schneider, Keith A. Bruett,* and *Quarles & Brady LLP,* Milwaukee, and *John P. Kennedy,* General Counsel, Johnson Controls, Inc., Milwaukee, and oral argument by *Matthew J. Flynn.*

For defendant-respondent, Travelers Indemnity Company, there was a brief by *Barry R. Ostrager, David W. Woll, Jonathan K. Youngwood,* and *Simpson Thacher & Bartlett,* New York, New York and *Janice A. Rhodes and Kravit, Gass, Hovel & Leitner, S.C.,* Milwaukee, and oral argument by *David W. Woll.*

For defendant-respondent, Employers Insurance of Wausau, there was a brief by *Keith A. Dotseth, Scott J. Ryskoski, Patrick J. Boley,* and *Larson King, LLP,* St. Paul, Minnesota; and *Timothy J. Muldowney, Todd G. Smith,* and *LaFollette Godfrey & Kahn,* Madison, and *Michael J. Cohen* and *Meissner Tierney Fisher & Nichols, S.C.,* Milwaukee, and oral argument by *Scott J. Ryskoski.*

For defendant-respondent, Transamerica Premier Insurance Company, there was a brief by *George N. Kotsonis, Gregory A. Kotsonis* and *Law Offices of George Kotsonis,* Milwaukee, and *Edwin J. Hull III, David P. Cutler* and *Cutler & Hull,* Chicago, Illinois.

An amicus curiae brief was filed by *Eric J. Nystrom* and *Lindquist & Vennum, PLLP,* Minneapolis, Minnesota; *Eugene R. Anderson, William G. Passannante, Gail Eckstein and Anderson Kill & Olick, P.C.,* New York, New York; and *Amy Bach,* Mill Valley, California, on behalf of United Policyholders.

An amicus curiae brief was filed by *Eric Englund,* Madison, on behalf of the Wisconsin Insurance Alliance.

An amicus curiae brief was filed by *Heidi L. Vogt* and *Cook & Franke, S.C.,* Milwaukee, and *Laura A. Foggan, John C. Yang, Thomas S. Garrett* and *Wiley Rein & Fielding LLP,* Washington, D.C., on behalf of the Complex Insurance Claims Litigation Association.

An amicus curiae brief was filed by *William J. Mulligan, Michael A. Dodge, Amy B. Tutwiler* and *Davis & Kuelthau, S.C.,* Milwaukee, and *John D. Shugrue, Daniel J. Struck* and *Zevnik Horton,* Chicago, Illinois, on behalf of Kraft Foods North America, Inc., and Kohler Company.

An amicus curiae brief was filed by *Robert H. Friebert, Shannon A. Allen* and *Friebert, Finerty & St. John, S.C.,* Milwaukee, and *Mark J. Plumer, Stephen T. Raptis* and *Swidler Berlin Shereff Friedman, LLP,* Washington, D.C., on behalf of the Wisconsin Utilities Association.

¶ 1. DAVID T. PROSSER, J. In 1980 Congress adopted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), popularly known as "Superfund," to promote the cleanup of haz-

ardous waste. The Act empowered the federal government, through the Environmental Protection Agency (EPA), to identify hazardous waste sites and pursue remedial activities. As part of the remedial process, the government was authorized to clean up properties and seek compensation from responsible parties or to require polluters and other responsible parties to perform the cleanup themselves. 42 U.S.C. §§ 9601–9675 (2000).[1]

¶ 2. CERCLA outlines a range of remedial procedures, beginning with requests to furnish information or documents, and ending with stringent enforcement actions to impose fines for noncompliance with orders or costs to recover the government's own expenditures. 42 U.S.C. §§ 9606, 9607.[2] For responsible parties, there is strict liability.

¶ 3. Nine years ago, this court considered its first case dealing with the insurance issues raised by CERCLA. In *City of Edgerton v. General Casualty Co. of Wisconsin,* 184 Wis. 2d 750, 517 N.W.2d 463 (1994), *cert. denied,* 514 U.S. 1017 (1995), we were asked to inter-

---

[1] All subsequent references to the United States Code are to the 2000 volumes unless otherwise indicated.

[2] Following the implementation of CERCLA, state legislatures enacted similar legislation that would apply to hazardous waste identified under the federal program as well as other substances that other states saw the need to control. *See City of Edgerton v. Gen. Cas. Co. of Wis.,* 184 Wis. 2d 750, 756 n.2, 517 N.W.2d 463 (1994) (citing Howell A. Burkhalter, Comment, *Liability for CERCLA Cleanup Costs—Are Insurers the Victims of Judicial Activism?,* 26 Wake Forest L. Rev. 221, 222 n.8 (1991)).

For purposes of simplicity, some references to CERCLA in this opinion are intended to include similar state legislative enactments.

pret key terms in the standard Comprehensive General Liability (CGL) policy in relation to CERCLA environmental damage claims.[3] A divided court decided that the issuance of letters by the EPA or the Wisconsin Department of Natural Resources (DNR), which either requested or directed an insured to participate in the environmental cleanup of contaminated property, did not constitute a "suit" sufficient to trigger the insurer's duty to defend. *Id.* at 771. We also held that cleanup and remediation costs under CERCLA did not constitute "sums that the insured may become legally obligated to pay as damages" within the indemnification provisions of CGL policies. *Id.* at 782.

¶ 4. Today the problems created by the *Edgerton* decision have become so obvious and so acute that they cannot be ignored. The court is convinced that we did not correctly analyze the term "damages" in the standard CGL policy in relation to environmental cleanup costs under CERCLA. We relied too heavily on a previous decision of this court involving very different facts and laws. We also created an unworkable interpretation

---

[3] The provision at issue in the *Edgerton* case reads in part:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

. . . .

B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such ... property damage, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . . .

*Edgerton,* 184 Wis. 2d at 769.

of the insurer's duty to defend in the specialized context of CERCLA letters and orders. The process of restoring consistency and coherence to the law must begin by overruling the *Edgerton* decision.

¶ 5. We hold that an insured's costs of restoring and remediating damaged property, whether the costs are based on remediation efforts by a third party (including the government) or are incurred directly by the insured, are covered damages under applicable CGL policies, provided that other policy exclusions do not apply. We also conclude that receipt of a potentially responsible party (PRP) letter[4] from the EPA or an equivalent state agency, in the CERCLA context, marks the beginning of adversarial administrative legal proceedings that seek to impose liability upon an insured. A PRP letter significantly affects legal interests of the insured. Therefore, a reasonable insured would expect this letter to trigger its CGL insurer's duty to defend.

---

[4] A potentially responsible party letter (PRP letter) is a letter issued by the EPA notifying the recipient that the EPA considers it to be a potentially responsible party for contamination at a given site. 42 U.S.C. § 9622(e). Under CERCLA, potentially responsible parties (PRPs) are expected to conduct cleanup or pay for the cleanup performed by others. *See Prof'l Rental v. Shelby Ins.*, 599 N.E.2d 423, 430–31 (Ohio Ct. App. 1991). The EPA identifies the PRPs at each site, negotiates with PRPs to do the cleanup, and recovers from PRPs the cleanup costs spent by the EPA. 42 U.S.C. §§ 9606, 9607, 9622.

I

¶ 6. This case involves a CGL policy coverage dispute between Johnson Controls, Inc.,[5] the plaintiff-insured, and more than 30 of its general liability insurance carriers (the insurers). The case has a long history. It began almost three years before this court decided *School District of Shorewood v. Wausau Insurance Cos.*, 170 Wis. 2d 347, 488 N.W.2d 82 (1992), and it has been buffeted ever since by a succession of contentious, inconsistent appellate decisions.

¶ 7. In November 1989 Johnson Controls brought suit in the Milwaukee County Circuit Court against its liability insurers seeking a declaratory judgment and coverage for various costs relating to the environmental cleanup of 21 property sites. These sites are located in 16 different states where Johnson Controls and/or Globe Union faced liability under CERCLA.[6] Most of the sites are lead smelting plants to which Johnson

---

[5] Johnson Controls is a Milwaukee-based manufacturer of products and services that manage the use of energy, control, comfort, and that protect life and property in commercial buildings. In 1978 Johnson Controls acquired Globe Union, Inc. (Globe Union), a manufacturer of automotive batteries, and the two companies eventually merged as Johnson Controls, Inc. For purposes of this opinion, references to "Johnson Controls" also include Globe Union, unless otherwise indicated.

[6] CERCLA, the Comprehensive Environmental Response, Compensation and Liability Act, Pub. L. No. 96–510, 94 Stat. 2767 (1980), empowers the executive branch of the federal government to identify and administer the cleanup of hazardous waste sites. 42 U.S.C. § 9604(a)(1). Response actions may include both removal and cleanup of spilled substances, along with other remedial actions. 42 U.S.C. § 9601(23)-(25). CERCLA established the Superfund as a source of expeditious payment for response actions, although ultimately the liability for response costs is placed on specified classes of responsible parties,

73

Controls and/or Globe Union delivered spent lead acid batteries and plant scrap for recycling. Some are contaminated landfills. Three of the 21 sites were owned and operated by Johnson Controls.[7] At 2 of the 21 sites, the coverage issues became moot because Johnson Controls ultimately incurred no costs or liability.

¶ 8. For 8 sites, Johnson Controls is seeking coverage for cleanup costs that it incurred in complying with a pre-suit demand from a federal agency, a state agency, or a non-government third-party to remediate

which include: past and present owners and operators of the sites; waste generators or other persons who arranged for disposal, treatment or transport of hazardous substances; and transporters of hazardous substances. 42 U.S.C. §§ 9611(a)(1), 9607(a). Responsible parties may be required to perform the cleanup under the mandate of a federal injunction, or the EPA will perform the cleanup itself and then sue responsible parties for reimbursement of costs it incurred. 42 U.S.C. §§ 9606(a), 9607(a)(A)-(B).

Congress amended CERCLA in 1986 in the Superfund Amendments and Reauthorization Act (SARA), Pub. L. No. 99–499, 100 Stat. 1613 (1986). This amendment served to strengthen the original legislation. Of note, SARA created a statutory right of contribution for responsible parties, allowing them to seek reimbursement of response costs from other parties responsible for contaminating the site. *See* 42 U.S.C. § 9613(f)(1).

Unless otherwise specified, references to CERCLA in this opinion refer to the statute as amended and codified at 42 U.S.C. §§ 9601–9675 (2000).

[7] TCI-Atlanta, JCI-Owosso, and JCI-Goshen.

the sites in accord with CERCLA.[8] These include the 3 sites that Johnson Controls owned.

¶ 9. For the remaining 11 sites, Johnson Controls was either sued or settled prior to suit for part of the costs of cleanup performed by another party. In some of these cases, the party seeking reimbursement for cleanup was a government agency. In the others, one or more private parties sought a contribution from Johnson Controls for contamination cleanup. Johnson Controls claims that in 6 of these 11 cases, its first awareness of any environmental problem was a lawsuit or demand from a government agency for money to pay costs for cleanup activities that had already been performed by other parties.[9]

¶ 10. Johnson Controls avers that in every instance it promptly notified its applicable CGL insurer or insurers of the CERCLA liability claims being made. In every instance the insurers refused to defend Johnson Controls or to indemnify it for any cleanup costs flowing from CERCLA or CERCLA-type claims. The insurers

---

[8] These 8 sites are: National Steel & Tube Distributors, Lakeland Disposal, JCI-Atlanta, National Smelting & Refining (NL-Atlanta), Maxey Flats, JCI-Owosso, USS Lead Refinery Inc., and JCI-Goshen.

[9] These sites, according to Johnson Controls, are: Bennington Landfill, NL Pedricktown, NL-Granite City, Auto Ion, Union Scrap Iron & Metal Company, Inc., and Delaware Sand & Gravel. The latter 2 sites, according to Johnson Controls, involved suits by the government for past cleanup costs already incurred, without any previous government directive having been issued to JCI. At the remaining 5 sites, Johnson Controls claims that a private party suit followed some prior directive from the government requesting that Johnson Controls remediate the site. These sites are: Bay Drums, Keefe Environmental Services, Inc., Hunt's Disposal, NL-Portland (Gould), and Tonolli.

justified their refusal on grounds that the CGL policies did not cover the costs imposed under CERCLA.

¶ 11. The Johnson Controls CGL policies were issued at various times between the years of 1954 and 1985, and they are either primary, excess, or umbrella comprehensive general liability policies. These policies provide that:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily [or personal] injury or property damage to which the policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage . . . .[10]

¶ 12. Johnson Controls' complaint asserted that this language required its insurers to reimburse Johnson Controls for its costs in complying with its liabilities at the 21 sites, and it sought a declaratory judgment to that effect.

¶ 13. The complexity of the case led to an extended period of discovery. On May 20, 1992, before the case could go to trial, this court decided *Shorewood,* by a 4–3 vote, in a manner that would have helped Johnson Controls. *See Sch. Dist. of Shorewood v. Wausau Ins. Cos.,* 168 Wis. 2d 390, 484 N.W.2d 314 (1992) (*Shorewood I*). Three months later, after a motion for reconsideration, the court withdrew its mandated opinion and a new 6–1 majority issued an opinion with a contrary analysis and an opposite result. *Sch. Dist. of*

---

[10] Although there is some minor deviation from this language in some of the policies at issue, for purposes of this appeal we view the language in the contested policies as substantively similar to the language presented.

*Shorewood v. Wausau Ins. Cos.*, 170 Wis. 2d 347, 488 N.W.2d 82 (1992) (*Shorewood*).

¶ 14. In November 1992 the court of appeals issued a unanimous decision in *City of Edgerton v. General Casualty Co. of Wisconsin*, 172 Wis. 2d 518, 493 N.W.2d 768 (Ct. App. 1992). This decision distinguished the *Shorewood* case and was helpful by implication to Johnson Controls. Nineteen months later, as the present case was awaiting trial, this court reversed and issued its own *Edgerton* opinion. *City of Edgerton v. Gen. Cas. Co. of. Wis.*, 184 Wis. 2d 750, 517 N.W.2d 463 (1994).[11]

---

[11] *Edgerton* involved the owner of a landfill site, Edgerton Sand and Gravel, Inc. (ES&G), and the City of Edgerton, the latter of which leased the site for use as the city landfill from 1968 to 1984. *City of Edgerton v. Gen. Cas. Co. of Wis.*, 184 Wis. 2d 750, 758–59, 517 N.W.2d 463 (1994). By 1978 the DNR had informed ES&G by letter that it suspected groundwater contamination at the site, and the DNR recommended that the landfill be closed and capped. *Id.* at 759. In 1984 volatile organic compounds were detected in the groundwater underneath and in the vicinity of the site. *Id.* ES&G closed the landfill in 1984 and, during the next year, the site was capped. *Id.* Though the site was closed, groundwater contamination remained, which compelled the DNR to recommend the landfill for placement on the EPA's list of contaminated sites for priority cleanup. *Id.* In June 1989 the EPA notified both ES&G and the City by certified letter that the EPA was investigating the site and the circumstances surrounding the presence of hazardous substances in and around the landfill. *Id.* at 750–60. The EPA then requested that the insureds respond to the DNR's request for information regarding the disposal of hazardous substances at the landfill from 1950 to 1984. *Id.* at 760.

In July 1989 the insureds forwarded the letters received from the EPA to their primary insurance carrier, General Casualty. *Id.* Each insured separately requested defense coverage, with ES&G specifically requesting that General Casualty

¶ 15. In *Edgerton,* we concluded that standard CGL policies do not provide indemnification coverage for an insured who cleans up an environmentally contaminated site, regardless of whether or not the insured owns the property, when the remediation is done pursuant to a government directive or request under CERCLA. *Id.* at 782–86. This holding was based on a conclusion that environmental response costs under CERCLA[12] constitute equitable relief, not legal damages, under the policy, and, thus, the insurer had no duty to indemnify its insured for these expenditures. *Id.* at 782. The majority also held that neither a potentially responsible party (PRP) letter nor a comparable notification letter from a state agency constituted a "suit" triggering the insurers' duty to defend. *Id.* at 771, 775. The court concluded that the primary attribute of a suit—that the parties are involved in "actual court proceedings"—was not present where an insured

pay any costs that it may have incurred regarding the site. *Id.* In February 1990 the DNR sent certified letters to both insureds, giving each 30 days to propose a plan for remediation of the site. *Id.* The DNR also indicated that failure to respond would result in the listing of the site on CERCLA's National Priorities List or the taking of immediate state action. *Id.* at 760–62. In response, ES&G notified its excess insurer of its receipt of the EPA information request letter and the DNR enforcement letter, requesting coverage of defense costs as well as any liability resulting from EPA or DNR claims. *Id.* at 762. The insurers denied liability coverage and refused to provide a defense for both the City and ES&G, prompting the insureds to seek a declaratory judgment defining the obligations of the insurance companies under their policies. *Id.*

[12] CERCLA defines "response costs" to include the costs of removing hazardous substances from the environment and the costs of other remedial work. *See* 42 U.S.C. § 9601(25).

merely receives notification of potential liability from the EPA or the DNR. *Id.* at 775.

¶ 16. Following the *Edgerton* decision, the insurers in this case moved for summary judgment, arguing that *Edgerton* established that no liability insurance coverage is provided for any insured who cleans up contaminated property pursuant to a government directive or request under CERCLA or similar state laws. On February 24, 1995, the Circuit Court for Milwaukee County, George A. Burns, Jr., Judge, granted summary judgment to the insurers and the case was dismissed as to all sites. Johnson Controls then appealed the various judgments and orders.[13]

¶ 17. Before the appeal was heard, this court decided another case bearing on legal issues at play in both *Edgerton* and the Johnson Controls appeal. In *General Casualty Co. of Wisconsin v. Hills,* 209 Wis. 2d 167, 561 N.W.2d 718 (1997), the insured, a service station owner, sought liability insurance coverage for a claim brought against him by a waste oil recycler seeking recovery of environmental response costs associated with a contaminated recycling site. *Id.* at 171–172. The EPA had placed the recycling site on the National Priorities List[14] and the United States had brought suit against the recycler and other defendants, but not against the service station owner. *Id.* No gov-

---

[13] At this time, one of Johnson Controls' insurers filed a cross-appeal to address the circuit court's dismissal of its counterclaim against Johnson Controls. The court of appeals ultimately reversed this decision. *Johnson Controls, Inc. v. Employers Ins. of Wausau,* Nos. 95–1796 & 95–2591, unpublished slip op. at 15–16 (Wis. Ct. App. Oct. 13, 1998).

[14] The National Priorities List is a list of polluted sites compiled by the EPA, as required by CERCLA. 42 U.S.C. § 9605. A site's placement on the list makes it eligible to be cleaned up

ernment agency had ever notified the insured service station owner of potential liability under CERCLA or requested that he develop a remediation plan or incur remediation and response costs. *Id.* at 180. This court held that, so long as there was no request or directive by the government, the insured was covered under his CGL policy for compensatory, monetary relief sought by third parties for losses they incurred due to the insured's alleged past contamination of the property. *Id.* at 185.

¶ 18. After *Hills* was decided in April 1997, the court of appeals addressed Johnson Controls' appeal. In an unpublished decision dated October 13, 1998, the court of appeals attempted to apply the holdings of *Edgerton* and *Hills* in assessing whether response and remediation costs incurred by Johnson Controls qualified as "damages" under Johnson Controls' CGL policies. *Johnson Controls, Inc. v. Employers Ins. of Wausau,* Nos. 95–1796 & 95–2591, unpublished slip op. (Wis. Ct. App. Oct. 13, 1998) (*Johnson Controls I*). The court developed four categories to determine whether the various sites would or would not be covered.

¶ 19. The first category consists of *Edgerton*-type sites. These involve situations where the insured is responsible for cleaning up the contamination at a site pursuant to a government directive under CERCLA, or a state counterpart, and the insured performs the cleanup. Citing *Edgerton* and *Amcast Industrial Corp. v. Affiliated FM Insurance Co.,* 221 Wis. 2d 145, 584 N.W.2d 218 (Ct. App. 1998), the court said that the costs of this type of remediation are not "damages" and,

through CERCLA-related means. *See Blasland, Bouck & Lee, Inc. v. City of N. Miami,* 283 F.3d 1286, 1289 n.1 (11th Cir. 2002) (citing 42 U.S.C. § 9605).

therefore, no insurance coverage is required in connection with the remediation of these sites.

¶ 20. The second category consists of situations governed by *Hills*. An insured is responsible for at least part of the contamination of a site that it does not own. The insured is not contacted by the government in any manner regarding cleanup of the property. Instead, a government agency has directed others responsible for the contamination to remediate the site and they, in turn, file suit against the insured to recover the cleanup costs attributable to the insured. Pursuant to the *Hills* holding, CGL coverage is given to an insured for remediation at these sites. *Id.*

¶ 21. The court of appeals then devised two new categories that it said were the logical extensions of the *Edgerton* and *Hills* decisions. *Johnson Control I,* Nos. 95–1796 & 95–2591, unpublished slip op. at 7–10.

¶ 22. The third category consists of situations in which the insured is at least partially responsible for contaminating a site that it does not own. It is then directed by a governmental entity to remediate the site, but fails to do so. The insured in category three, like the insured in *Regent Insurance Co. v. City of Manitowoc,* 205 Wis. 2d 450, 463, 556 N.W.2d 405 (Ct. App. 1996), is *sued* by the government to recover money that the government spent to remediate the site.[15] According to

---

[15] *Regent Insurance Co. v. City of Manitowoc,* 205 Wis. 2d 450, 556 N.W.2d 405 (Ct. App. 1996), held that where the government sues "an insured to recover incurred cleanup costs under § 107(a)(4)(A) of [CERCLA] . . . or to impose a plan for remediation, that action is not a 'suit for damages' but is, rather, a suit for 'equitable monetary relief.' " *Id.* at 463. Johnson Controls argued before the court of appeals that our decision in *Hills* overruled *Regent.* The court of appeals disagreed, noting that the vitality of *Regent* was reaffirmed post-*Hills* by *Hydrite*

81

the court of appeals' analysis, the recovery sought by the government remains equitable in nature and, therefore, no insurance coverage is obtained in the situations encompassed by category three. *Johnson Control I,* Nos. 95–1796 & 95–2591, unpublished slip op. at 11.

¶ 23. A fourth category consists of situations similar to category three, except that the insured is sued by the site's owner or by other third parties who are also responsible for the contamination, any of whom cleaned up the site at the government's direction. The government is not involved in the suit against the insured. As with categories one and three, the court of appeals concluded that there is no insurance coverage for sites in this category. *Id.*

¶ 24. The court of appeals indicated that categories three and four are subsumed under the rationale of *Edgerton,* since neither the government nor the third party in these cost recovery actions is seeking "legal damages" for injury to property caused by an insured. The rationale for non-recovery was later explained as follows:

> Rather, the government and property owners forced by the government to clean up contamination allegedly caused by Johnson Controls are seeking what *Edgerton* noted was "equitable monetary relief," that is, recompense for monies spent in complying with the nation's environmental-protection laws—*money that would have been spent by Johnson Controls if it had complied with the government's cleanup directives.*

*Johnson Controls v. Employers Ins. of Wausau,* 2002 WI App 30, ¶ 9, 250 Wis. 2d 319, 640 N.W.2d 205 (*Johnson Controls II*), (citing *Edgerton,* 184 Wis. 2d at 784).

*Chemical Co. v. Aetna Casualty & Surety Co.,* 220 Wis. 2d 26, 39 n.5, 582 N.W.2d 423 (Ct. App. 1998).

¶ 25. Having articulated the preceding categories, the court of appeals remanded the matter for the entry of a global judgment, instructing the circuit court to break down its decision into subparts reciting: "(1) the property involved; (2) the insurance company or companies and the relevant dates of their policies that relate to the property; and (3) the result required by this opinion." *Johnson Controls I*, Nos. 95–1796 & 95–2591, unpublished slip op. at 12.

¶ 26. On remand, the Milwaukee County Circuit Court, Michael P. Sullivan, Judge, determined that all 21 sites at issue fell into categories one, three, or four, meaning that the costs incurred by Johnson Controls at these sites were not "legal damages" entitled to insurance coverage under its CGL policies. Johnson Controls appealed once again. After concluding that the circuit court's findings of fact were not clearly erroneous, the court of appeals affirmed the circuit court's finding that no coverage was afforded to Johnson Controls. *Johnson Controls II*, 250 Wis. 2d 319, ¶ 26. Johnson Controls petitioned this court for review, which we granted.

## II

¶ 27. The core of this matter is the continuing vitality of *Edgerton*. While Johnson Controls maintains that, even if *Edgerton* is upheld, the insurers must provide coverage in situations governed by categories three and four of the *Johnson Controls I* schema, it nonetheless launches an overt assault on *Edgerton's* holdings. Johnson Controls asks this court to overrule *Edgerton* because the decision was a misapplication of Wisconsin law, it created an arbitrary and unworkable system for resolving issues that arise in the context of insurance coverage for environmental damage, and the legal rationales for the decision have completely eroded.

83

Conversely, the insurers beseech this court to uphold its precedent, adhere to the rationale of *Edgerton,* and, upon doing so, recognize that categories three and four must necessarily be denied coverage consonant with *Edgerton.*

¶ 28. In determining whether *Edgerton* should survive, we engage in two levels of analysis. First, we must assess whether the conclusions of *Edgerton* were incorrect as a matter of law. If we determine that the opinion was fundamentally wrong, then we must grapple with *Edgerton's* standing as controlling legal precedent in Wisconsin. In other words, even if this court determines conclusively that *Edgerton* misapplied principles of Wisconsin insurance law and misconstrued the nature of the relief sought in CERCLA cost recovery actions, we still must decide whether these errors require the court to overrule its recent precedent and deviate from the doctrine of stare decisis.

### III

¶ 29. Johnson Controls seeks coverage under its various CGL policies. With regard to the insurers' duty to indemnify, the policies provide: "The [insurer] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which the policy applies, caused by an occurrence." As for the insurers' duty to defend, the policies provide that the insurer "shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage." All policies at issue have language either identical or substantially similar to the preceding terms.

¶ 30. The interpretation of words or clauses in an insurance contract is a question of law that we review de novo. *See Just v. Land Reclamation, Ltd.,* 155 Wis. 2d 737, 744, 456 N.W.2d 570 (1990). As we explained in *Hills,* the method by which Wisconsin courts determine whether an insurance contract requires coverage of a particular claim is familiar:

> In general, the interpretation of an insurance contract is controlled by principles of contract construction. *See, e.g., Kuhn v. Allstate Ins. Co.,* 193 Wis. 2d 50, 60, 532 N.W.2d 124 (1995); *Maas [v. Ziegler],* 172 Wis. 2d [70], 79, 492 N.W.2d 621 [(1992)]. The primary objective in interpreting a contract is to ascertain and carry out the intentions of the parties. *See, e.g., Maas,* 172 Wis. 2d at 79; *Kremers-Urban Co. v. American Employers Ins. Co.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). "Of primary importance is that the language of an insurance policy should be interpreted to mean what a reasonable person in the position of the insured would have understood the words to mean." *Sprangers,* 182 Wis. 2d at 536; *accord, e.g., Kuhn,* 193 Wis. 2d at 60; *Kremers-Urban Co.,* 119 Wis. 2d at 735.

*Hills,* 209 Wis. 2d at 175. These principles guide our interpretation of the policy language at issue in this case.

A. Are CERCLA Response Costs Damages?

¶ 31. We first address whether CERCLA response costs are "sums which the insured shall become legally obligated to pay as damages." To answer this question, we must comprehend the nature of environmental

response costs as understood by a reasonable insured faced with CERCLA liability.[16]

¶ 32. The insurers contend that, when the government seeks cleanup costs under the authority of CERCLA (or similar state regulation), the government is seeking relief in the form of (a) restitution through a cost-recovery action,[17] or (b) injunction through administrative order.[18] Because the insurers argue that both forms of relief are "equitable," that is, not "legal damages," coverage is excluded.

---

[16] As we stated in *Hills,* the focus of our analysis in this case is on interpretation of the insurance policies and not on environmental law. *General Casualty Co. of Wisconsin v. Hills,* 209 Wis. 2d 167, 175, 561 N.W.2d 718 (1997). The parties and amici curiae have extensively argued, in varying forms, how competing interpretations of the CGL policy will impact on the efficient and effective remediation of pollution. While we are sensitive to these issues, these discussions are not probative of whether coverage obtains under Johnson Controls' policies.

[17] 42 U.S.C. § 9607(a)(4)(A).

[18] Section 107(a)(4) of CERCLA, codified as 42 U.S.C. § 9607(a)(4), establishes the right of a cost recovery action of parties against other parties responsible for contamination at a site remediated under CERCLA. It provides that all responsible parties

shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release[.]

42 U.S.C. § 9607(a)(4). In the alternative, the government can seek, under certain circumstances, a court order to require

¶ 33. Johnson Controls takes the opposite position. It contends that response costs are "damages" from the perspective of an ordinary insured because the law imposes costs on the insured to remediate property that the insured previously damaged. These response costs should thus be covered.

¶ 34. When this issue was first addressed in *Edgerton,* a majority of the court concluded that CERCLA response costs do not constitute "damages" under standard CGL policies. *Edgerton,* 184 Wis. 2d at 782. The *Edgerton* majority looked primarily to *School District of Shorewood,* 170 Wis. 2d 347, for guidance in interpreting the "as damages" language in the insureds' CGL policies.

¶ 35. In *Shorewood,* two school districts sought liability insurance coverage under their CGL policies for their costs in defending an action for declaratory and injunctive relief and their costs in complying with

responsible parties to perform remedial actions through a Unilateral Administrative Order. This authority is granted under Section 106 of CERCLA, which provides in part:

> In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

42 U.S.C. § 9606(a).

the terms of a subsequent settlement to correct alleged practices of illegal segregation and racial discrimination in education. *Id.* at 356–62.[19] The court noted that:

> The apparent goal of the plaintiffs in the underlying action was the desegregation of the Milwaukee area school system. The amended complaint sought only declaratory and injunctive relief whose purpose was "to eliminate the remaining vestiges of segregation in the school districts and schools in the Milwaukee metropolitan area." The amended complaint did not seek to presently compensate the victims of past discrimination. Therefore, no "damages" were sought in the underlying action.

*Id.* at 371.

¶ 36. The *Shorewood* court recognized that the types of costs being sought were largely to indemnify the school district for future public expenditures. To explain why such costs did not fall within our traditional concept of "damages," the court concluded that the term "damages," when used in CGL insurance policies, unambiguously means "legal damages"—that is, "legal compensation for past wrongs or injuries"—which are generally pecuniary in nature. *Id.* at 368. Then the court added: "The term 'damages' does not encompass the cost of complying with an injunctive decree." *Id.*

¶ 37. This last sentence was critical. Citing *Black's Law Dictionary,* Professor Dan Dobbs' *Handbook on the Law of Remedies* (1973), *Pure Milk Products Cooperative v. National Farmers Organization*

---

[19] As in this case and in *Edgerton,* the policies at issue in *Shorewood* qualified the insurer's duty of indemnification to only those sums which the insured is "legally obligated to pay as damages." *Sch. Dist. of Shorewood v. Wausau Ins. Cos.,* 170 Wis. 2d 347, 358 n.1, 488 N.W.2d 82 (1992).

(*Pure Milk II*), 90 Wis. 2d 781, 280 N.W.2d 691 (1979), and *Milliken v. Bradley* (*Milliken II*), 433 U.S. 267 (1977), the court hammered the distinction between compensation for past wrongs and injunctive relief that looks to the future.

> An injunction looks to the future conduct of the parties and is preventive in nature. Damages, on the other hand, are remedial in nature, not preventive. The remedy of injunction is only available if the plaintiff can establish that a continuing or anticipated injurious act is not adequately compensable in damages.

*Shorewood,* 170 Wis. 2d at 370 (citing *Pure Milk II,* 90 Wis. 2d at 800).

¶ 38. In retrospect, the rationale for the *Shorewood* decision was too broadly stated, and we reject its overly restrictive definition of damages.

¶ 39. Succeeding courts should have noticed that the *Shorewood* court's key sentence—"The term 'damages' does not encompass the cost of complying with an injunctive decree"—was inconsistent with the language of authorities quoted in the opinion.

¶ 40. For instance, *Shorewood* cited Dobbs, *Handbook on the Law of Remedies,* for the proposition that judicial remedies fall into four major categories: damage remedies, restitutionary remedies, coercive remedies (such as injunctions that are backed by the court's contempt power), and declaratory remedies. *Shorewood,* 170 Wis. 2d at 368 (citing Dobbs, *supra,* § 1.1 at 1 (1973)). The court then summarized the law: "This classification scheme is based on the *nature* and *purpose* of the relief awarded. . . . *A classification based on the form of the action, as either equitable or legal, is irrelevant.*" *Id.* at 369 (emphasis added). The substance

89

of Dobbs' 1973 treatise is that if the *purpose* of a remedy is to compensate a party for some loss, the purpose of the remedy overshadows the *form* of the action.

¶ 41. We note that Justice Abrahamson cited the same Dobbs treatise and the exact same page in the original *Shorewood* opinion, writing that "Although the main purpose of 'damages' at law is generally viewed as compensatory, the damages remedy is not wholly compensatory. At the same time, mandatory injunctive relief may also be 'compensatory' in nature." *Shorewood I,* 168 Wis. 2d at 416 (citing Dobbs, *Handbook on the Law of Remedies* § 1.1, at 1 (1973)).

¶ 42. *Shorewood* also quoted from *Pure Milk II:* "[A]n injunction is designed to prevent injury, *not to compensate for past wrongs,* and [ ] an injunction may issue merely upon proof of a sufficient threat of future irreparable injury." *Shorewood,* 170 Wis. 2d at 370 (quoting *Pure Milk II,* 90 Wis. 2d at 802) (emphasis added). But *Pure Milk II* also explained that:

> The injunction is a preventive order looking to the future conduct of the parties. To obtain an injunction, a plaintiff must show a sufficient probability that future conduct of the defendant will violate a right of and will injure the plaintiff. To invoke the remedy of injunction the plaintiff must moreover establish that the injury is irreparable, *i.e. not adequately compensable in damages.*

*Pure Milk II,* 90 Wis. 2d at 800 (citations omitted) (emphasis added).

■

¶ 43. A careful reading of these authorities suggests that if an equitable action is providing compensation for past wrongs—if it is "remedial in nature"—it

cannot be lumped indiscriminately with a typical injunction, because it is serving a different purpose from a typical injunction.

¶ 44. The *Edgerton* opinion was too quick to embrace the strict dichotomy between legal damages and equitable actions set out in *Shorewood*. The *Edgerton* court's five-page discussion of damages relied heavily on *Shorewood*'s key sentence that "The term 'damages' does not encompass the cost of complying with an injunctive decree," and it constructed its analysis to conform to that faulty principle. *Edgerton,* 184 Wis. 2d at 783 (quoting *Shorewood,* 170 Wis. 2d at 368).

¶ 45. *Edgerton* made a second mistake. It misapplied *Shorewood*'s holding regarding the scope of the "as damages" limitation in CGL policies because it did not appreciate the nature of liability for environmental cleanup costs under CERCLA or how that liability would be understood by a reasonable insured. The *Edgerton* majority summarily concluded that response costs under CERCLA were equitable relief similar to the school districts' settlement in *Shorewood, Edgerton,* 184 Wis. 2d at 785,[20] and, as such, were not designed to compensate aggrieved parties for past wrongs and did not fall within the policy coverage. *Id.* The majority reasoned that response costs were designed to deter future contamination by means of an injunctive action, *"while providing for remediation and cleanup of the affected site[s]." Id.* (emphasis added).

---

[20] This conclusion seems to follow a subtle error in the *Shorewood* decision. The paradox of *Shorewood* is that it correctly instructed courts not to look to the form of the action but to the nature of the relief requested, *Shorewood,* 170 Wis. 2d at 369, but it then ignored this command itself in deeming *all* injunctive relief as being equitable in nature.

¶ 46. The distinction between legal and equitable remedies relied upon in *Shorewood* has very limited applicability to CERCLA. Because CERCLA serves dual purposes and provides multiple avenues for achieving these purposes, the operation of the statute and its legal obligations will be confused if one attempts to fit the nature of the liability imposed into a strict equitable/legal damages dichotomy. *See* John A. Mathias, Jr., et al. *Insurance Coverage Disputes* § 9.02[1], at 9–18 (1996 & Supp. 2003).

¶ 47. CERCLA attempts to promptly remediate polluted sites to bring land back to its original uncontaminated condition. However, CERCLA also imposes liability.[21] The costs of accomplishing remediation efforts are expressly expected to be borne by the parties responsible for the polluted condition of the land.[22] The only reason Johnson Controls had to expend money for the sites named in its complaint, either to clean up the properties directly or to reimburse others who had remediated the properties, was because its liability under CERCLA had been established, based on its contribution, in some form, to the pollution of the properties.

¶ 48. Under this system, the nature of relief in CERCLA response cost actions is not confined to future

---

[21] *See Aviall Servs., Inc. v. Cooper Indus., Inc.*, 312 F.3d 677, 681 (5th Cir. 2002) ("CERCLA's twin purposes are to promote prompt and effective cleanup of hazardous waste sites and the sharing of financial responsibility among the parties whose actions created the hazards.").

[22] *See, e.g., Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91–92 (3d Cir. 1988); Blake A. Watson, *Liberal Construction of CERCLA Under the Remedial Purpose Canon: Have the Lower Courts Taken a Good Thing Too Far?*, 20 Harv. Envtl. L. Rev. 199, 279 (1996).

injuries; it includes "legal recompense for injuries sustained." *See Shorewood,* 170 Wis. 2d at 372.[23] Thus, there is both a prospective and remedial element to an insured's response cost liability. Because CERCLA proceedings seek the costs of repairing damaged property, rather than the cost of conforming one's future conduct, the nature of relief is, at least in part, compensatory. *See Boeing Co. v. Aetna Cas. & Sur. Co.,* 784 P.2d 507, 511 (Wash. 1990). The harm for which CERCLA liability attaches is based on past wrongs and injuries to property, *Shorewood,* 170 Wis. 2d at 368, and may be characterized as consequential damages flowing from the direct damage caused to the environment. *See Minn. Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175, 182 (Minn. 1990).

¶ 49. The availability of cost recovery actions under Section 107 of CERCLA shows that a responsible party's liability under CERCLA *is* adequately compensable as damages. In fact, a government injunction to an insured to remediate contaminated property is an alternative to a monetary damages action for injury to the property.[24] Under CERCLA, injunctive relief may be

---

[23] *See Fed. Ins. Co. v. Susquehanna Broad. Co.,* 727 F. Supp. 169, 174 (M.D. Pa. 1989) ("To recognize that damages are not equitable relief does not answer the specific question whether the costs of restoring land to its original condition are, nevertheless, recoverable in damages."); *C.D. Spangler Const. Co. v. Indus. Crankshaft & Eng'g Co., Inc.,* 388 S.E.2d 557, 568 (N.C. 1990) (citing *Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188, 1194 (9th Cir. 1986)) ("once 'property damage' occurs injuring a third party, costs associated with remedying it are 'damages' within the meaning of the liability policy").

[24] *See Boeing Co. v. Aetna Cas. & Sur. Co.,* 784 P.2d 507, 512 (Wash. 1990) (quoting *United States Aviex Co. v. Travelers Ins. Co.,* 336 N.W.2d 838, 843 (Mich. App. 1983)):

available *even though* legal or restitutive remedies are adequate. *See AIU Ins. Co. v. Superior Court,* 799 P.2d 1253, 1277 (Cal. 1990). This option is one of several factors that distinguish CERCLA remedies from the traditional injunctions described in *Shorewood.*

¶ 50. CERCLA does not regulate prospective conduct in the traditional sense that governments regulate commercial behavior. *See New York v. Shore Realty Corp.,* 759 F.2d 1032, 1041 (2d Cir. 1985) ("CERCLA is not a regulatory standard-setting statute such as the Clean Air Act."). Rather, it seeks to impose strict liability on corporations and other entities for damages to property done in the past. None of the costs at issue in this case appear to have been incurred by Johnson Controls to improve the cleanliness of ongoing processing or to comply with government regulations requiring business practices conforming to some standard.[25] Therefore, an injunction in this context is materially

---

If the state were to sue in court to recover in traditional "damages", including the state's costs incurred in cleaning up the contamination, for the injury to the ground water, defendant's obligation to defend against the lawsuit and to pay damages would be clear. It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs.

[25] In fact, another federal statute, the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6992, which preceded CERCLA by a few years, regulates the present-day handling of hazardous wastes and carries its own enforcement mechanisms. *See Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 483 (1996) ("RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste. Unlike [CERCLA] RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards. RCRA's primary purpose, rather, is to

distinguishable from a traditional injunction, such as the one at issue in *Shorewood.*

¶ 51. It is true that the protection of human health and welfare is a future benefit from remediating damaged property. However, shifting the focus from remediating past damages to preventing future injury from contamination does not change the remedial nature of CERCLA response costs for *completed* past actions.

¶ 52. The *Edgerton* opinion points to 42 U.S.C. § 9607(a), paragraphs (A) and (C), to justify its conclusion that response costs are not damages, asserting that response costs "are, by definition, considered to be equitable relief and reflect a congressional intent to differentiate between cleanup or response costs under 42 U.S.C. sec. 9607(a)(4)(A) and damages for injury, destruction, or the loss of natural resources under 42 U.S.C. sec. 9607(a)(4)(C)." *Edgerton,* 184 Wis. 2d at 784. This conclusion was then, and is now, disputed by other courts.[26]

¶ 53. In § 9607(a), CERCLA outlines four kinds of liability, one of which speaks of "damages." However, while the four kinds of liability are not congruent, that does not mean they do not overlap, nor does it mean that a reasonable insured would expect coverage for one government response to environmental damage but not for another. In any event, *Edgerton* implies that *any* government involvement with the insured precludes

reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.' ") (citations omitted).

[26] *See, e.g., United States Aviex Co. v. Travelers Ins. Co.,* 336 N.W.2d 838, 843 (Mich. App. 1983).

coverage, whether the coverage is sought as damages under (A) or (C) of § 9607(a)(4).

¶ 54. In *Shorewood,* the court acknowledged that the school districts had cited many cases "which have held that environmental cleanup costs under [CERCLA] constitute 'damages' under the terms of insurance policies." *Shorewood,* 170 Wis. 2d at 372–73. It went on to say that courts around the country "do not uniformly agree that clean-up costs under CERCLA constitute 'damages' under the terms of insurance policies." *Id.* at 373. Then, significantly, the court said:

> The issue of whether clean-up costs constitute "damages" under the terms of an insurance contract has never been addressed by a Wisconsin court. *Such an important issue should not be decided in a cursory fashion by this court.* Therefore, we decline to adopt or apply the analogy posited by the school districts.

*Id.* at 374 (emphasis added). Unfortunately, the *Edgerton* court treated CERCLA response costs as though the issue had been decided in *Shorewood,* when it had not.

¶ 55. There is a third deficiency in the *Edgerton* opinion. *Shorewood* quoted extensively from Professor Dan Dobbs, a "noted authority on remedies." *Shorewood,* 170 Wis. 2d at 368–69. The quotations were taken from the 1973 edition of Dobbs' *Handbook on the Law of Remedies.* In the 1993 revision of his treatise, Professor Dobbs directly addresses the issue of response costs in environmental damages actions and concludes:

> Response costs recoverable [under CERCLA] are analogous to repair costs and consequential damages that a private landowner-plaintiff might recover in similar situations. ... Such items [of response costs] are closely analogous to common law consequential dam-

ages. . . . Response costs are very high, but in spite of the terminology, they closely resemble familiar common law types of damages.

Dan B. Dobbs, *Law of Remedies* § 5.2(5), at 727 (1993).

¶ 56. , Professor Dobbs then made clear that there is no fundamental distinction between response costs (sought under 42 U.S.C. § 9607(a)(4)(A)-(B)) and natural resource damages (sought under § 9607(a)(4)(C)) as to their classification as "damages."

> The normal terminology of the law would probably treat the recovery for natural resource damages and also the recovery of response costs as damages. Both compensate for loss incurred. It often happens, however, compensation and restitution turn out to yield the same dollar amount. That might be the case with response costs. . . .

> . . . [I]t is important to characterize a liability as restitutionary only if restitution differs in amount from damages or if there is no substantive basis for recovery as damages. Under [CERCLA], there is a substantive basis for recovery of "response costs," which are not otherwise characterized by the statute. The amount to be recovered does not differ according to the characterization as restitution or damages. *Attempts to characterize the recovery of response costs as either restitution or damages do not seem helpful.* Usually the attempt is made only to determine whether an insurance policy covers liability for release of hazardous substance. *It is doubtful that the term "damages" in an insurance policy carries with it any such inchoate set of distinctions and the question whether response costs are covered by the policy probably cannot turn on proposed definitions of those costs as restitution without distorting the remedial concepts involved.*

*Id.* at 729–30 (footnote omitted) (emphasis added). The explanation offered by Professor Dobbs severely weakens *Edgerton*'s basis for construing the "as damages" language as exempting CERCLA response costs based on their remedial nature. The dissent in *Edgerton* quoted from the 1993 treatise. *Edgerton,* 184 Wis. 2d at 792–93 (Abrahamson, J., dissenting). The majority opinion never rebutted the dissent's use of Dobbs or acknowledged that one of the main props of the *Shorewood* opinion had been removed.

¶ 57. There is a fourth problem with *Edgerton,* as was revealed in *Hills.* The court stated in *Hills* that, "It has long been the law of this state that the cost of *repairing* and *restoring* damaged property and water to its original condition is a proper measure of compensatory damages." *Hills,* 209 Wis. 2d at 181 (emphasis added). The court cited a number of cases and authorities to support this proposition.[27] The *Edgerton* opinion simply did not address this body of law.

¶ 58. This brings us to *Hills.* In *Hills,* we concluded that, when a third party sues an insured for

_____

[27] In support of this proposition, the *Hills* court cited *Jost v. Dairyland Power Coop.,* 45 Wis. 2d 164, 172 N.W.2d 647 (1969); *Anstee v. Monroe Light & Fuel Co.,* 171 Wis. 291, 177 N.W. 26 (1920); *Pedelty v. Wisconsin Zinc Co.,* 148 Wis. 245, 134 N.W. 356 (1912); *Fortier v. Flambeau Plastics Co.,* 164 Wis. 2d 639, 476 N.W.2d 593 (Ct. App. 1991); 1 Russell M. Ware, *The Law of Damages in Wisconsin* §§ 18.4 & 18.22 (1988 & Supp. 1996); Wis JI—Civil 1804. *See also Wisconsin Public Serv. Corp. v. Heritage Mut. Ins. Co.,* 200 Wis. 2d 821, 830, 548 N.W.2d 544 (Ct. App. 1996), *aff'd,* 209 Wis. 2d 160, 561 N.W.2d 726 (1997) ("*Nischke [v. Farmers & Merchants Bank & Trust,* 187 Wis. 2d 96, 522 N.W.2d 542 (Ct. App. 1994)] is instructive because it stands for the proposition that when a landowner spends money in response to a government directive to remediate, the money can be recovered as legal damages from the tortfeasor.").

reimbursement of the third party's response costs under CERCLA and the insured then seeks liability insurance coverage, the insured is seeking coverage for legal damages to compensate the third party for past wrongs. *Id.* at 181.

¶ 59. *Hills* made a valiant attempt to coexist with *Shorewood* and *Edgerton.* It explained why principles of Wisconsin law on remedies afforded coverage to Hills. The court said that the third party seeking contribution from the insured was not seeking a remedy based on the insured's failure to take corrective action or failure to aid in the prospective remediation of the property. Rather, "the fundamental remedy Arrowhead [third party] seeks from Hills [insured] is compensatory damages *for the past injuries he allegedly inflicted on the Arrowhead site." Id.* at 182 (emphasis added). In truth, this language simply relabeled the contribution to response costs as compensatory damages for past injuries.

¶ 60. Although *Hills* purported to sustain the rule of *Edgerton,* it effectively obliterated its intellectual foundation. To find coverage under the same CGL policies that were at issue in *Edgerton, Hills* concluded that the nature of the relief sought in the cost recovery action *was not* merely equitable relief.[28] Furthermore,

----

[28] The rule of contribution *is* an equitable rule. *See Wagner v. Daye,* 68 Wis. 2d 123, 125, 227 N.W.2d 688 (1975); *Hartford Accident & Indem. Co. v. Worden-Allen Co.,* 238 Wis. 124, 132, 297 N.W. 436 (1941). Although the right to contribution in CERCLA actions is now statutorily granted, the nature of the relief remains the same. Moreover, "The fact that an action may be founded in principles of equity, however, does not mean that the suing party does not seek monetary compensation." *Sauk County v. Employers Ins. of Wausau,* 202 Wis. 2d 433, 443 n.1, 550 N.W.2d 439 (Ct. App. 1996).

*Hills,* unlike *Edgerton,* faithfully applied long-standing principles of Wisconsin insurance contract law and factored into its calculus the reasonable expectations of an insured. It recognized that "The CGL policy was designed to protect an insured against liability for negligent acts resulting in damage to third parties." *Id.* at 183–84 (quoting Arnold P. Anderson, *Wisconsin Insurance Law* § 5.14, at 136 (3d ed. 1990 & Supp. 1997)).[29]

¶ 61. The basic differences between the *Edgerton* facts and the *Hills* facts are as follows: (1) Edgerton owned the contaminated property, Hills did not; (2) Edgerton cleaned up the damaged property, Hills was asked to contribute to government cleanup costs; (3) Edgerton was contacted directly by government, Hills was not; (4) Hills was brought into a formal lawsuit, Edgerton was not. The principal distinction between the *Hills* category of cases and the court of appeals' fourth category is that there was contact between the government and the insured before the insured was sued by a third party.

¶ 62. This distinction is arbitrary. If we were to honor this distinction, coverage for CERCLA response cost liability would turn on the fortuity of whether the insured had ever been contacted in some manner by the government regarding the remediation of a site for

---

[29] This view has been subsequently applied by the court of appeals. *See Sauk County v. Employers Ins. of Wausau,* 202 Wis. 2d 433, 443, 550 N.W.2d 439 (Ct. App. 1996) ("*Hills* held that the purpose of CGL policies is to indemnify insureds for damage they cause to others' property.") (referring to the court of appeals decision in *Hills,* 201 Wis. 2d 1, 548 N.W.2d 100 (Ct. App. 1996), which was subsequently affirmed by this court).

which the insured was a potentially responsible party. In short, government contact would mean loss of coverage.

¶ 63. If we were to conclude that this distinction is indefensibly arbitrary and contrary to the expectation of a reasonable insured, we would realize that the principal distinction between the third category and the fourth category is that the government files suit for compensation instead of a private party. This again is fortuitous and not what a reasonable insured would expect.

¶ 64. It makes little sense in determining whether "damages" have occurred under the policy whether the party bringing a legal action for contribution to remediate damaged property is a governmental agency or some other entity.[30] Certainly this distinction was not bargained for, nor is it manifested anywhere in the CGL policies. The nature of the relief sought against an insured for damage that it caused should not change based on the identity of the claimant in a CERCLA cost recovery action.[31]

---

[30] *See* Todd M.W. Turall, *If at First You Don't Succeed . . . Change the Facts?: New Hope for Insureds Seeking Defense and Indemnification from Insurance Companies for Environmental Cleanup Costs,* 6 Wis. Envtl. L.J. 119, 140 (1999) ("To an insured [facing liability under CERCLA], there is no real difference between being sued by another party and being sued by a government agency.").

[31] We doubt that *Edgerton* contemplated the consequences of this artificial distinction. In *Edgerton,* the majority compared cost recovery actions under § 107(a)(4)(A) with natural resource damages claims under § 107(a)(4)(C), the latter of which the court acknowledged were "damages." *Edgerton,* 184 Wis. 2d at 784–85. However, only the government can bring a natural resource damages claim under this subsection. *See* 42 U.S.C.

¶ 65. Perhaps the best example of the arbitrariness of these distinctions is illustrated by *Hills.* The defendants in the underlying action in *Hills,* who were sued by the EPA for declaratory relief and recovery of response costs, would be precluded from coverage under a standard CGL policy if they were governed by *Edgerton.* They would fall into the court of appeals' category three. Meanwhile, Hills and the hundreds of other potentially responsible parties (PRPs) who were impleaded by these original defendants would receive coverage, despite the fact that the third-party complaint against them sought contribution for the same CERCLA response costs. We do not believe it is rational or equitable that an insured's coverage should depend upon the assiduousness of the government in contacting the insured as a potentially responsible party. In a cost recovery action under CERCLA, the EPA is not required to sue all PRPs, nor is it required to locate or contact all PRPs at earlier stages in the remediation process. *See* William T. Stuart, Comment, *City of Edgerton: Creating a Friendlier Forum for Insurance Companies,* 80 Marq. L. Rev. 853, 873 (1997).[32]

---

§ 9607(f)(1). Yet, under the government-as-a-claimant theory propounded by the insurers, costs under § 106(a)(4)(C) actions should not be covered under the policies.

[32] A similarly odd result can be imagined under the *Edgerton* case if its facts had changed slightly, as explained by one commentator:

> The only difference in *Hills* and *Heritage* is that in those cases the DNR contacted a third party, who then was forced to file a suit to bring in *Hills* and *WPS* respectively, instead of the DNR or EPA contacting them directly. Based on this distinction, Edgerton would have been covered by its CGL (ignoring the owned-property exclusion) if the EPA and DNR had directly contacted only ES&G, and ES&G had filed a suit against Edgerton, because then the costs incurred by Edgerton would have constituted "damages"

¶ 66. The interplay between *Hills* and *Edgerton* has created an exceedingly tenuous situation. We have no doubt that the court of appeals, in creating categories three and four, was attempting quite admirably to reconcile the *Hills* and *Edgerton* holdings.[33] It did so by constructing a system that did not create perverse incentives for insureds to purposefully refuse to respond to a government remediation directive, allow the pollution to go unremediated, and wait to be sued before undertaking cleanup actions, so that coverage would result. But the court's four-category schema exposed how arbitrary the distinctions are. The only sensible conclusion is that CERCLA response costs for which a party becomes liable, in whatever form that liability is pursued, are "damages" for that party's liability for prior damage to property and must be indemnified.

¶ 67. An especially disconcerting result of the nearly decade-old *Edgerton* line of cases is that the

rather than response costs. In practice, this distinction seems to be irrelevant and merely technical, and may lead to insureds manipulating their situations to ensure that they will never incur response costs but will wait until a third party files a suit against them to recover "damages."

Turall, *supra,* at 138 (footnotes omitted).

[33] We also note that the Seventh Circuit of the United States Court of Appeals provided a cogent analysis and basis for its decision in *Wisconsin Power & Light Co. v. Century Indemnity Co.,* 130 F.3d 787 (7th Cir. 1997). The court concluded that if the costs an insured would incur in response to a government directive to clean up land would not be recoverable "damages," then when the insured ignores the request and is thereafter sued by another party for contribution in the costs of remediating that land, no coverage should follow. *Id.* at 792. If coverage did obtain, the uncovered response costs could be transmuted into legal damages. *Id.* This is the category four scenario.

categorization scheme for determining liability coverage is now well removed from the language of the insurance contract.[34] The source of this problem can be traced to *Edgerton*'s failure to comport with the broad language of Johnson Controls' CGL policy and with the reasonable expectations of the insured.

¶ 68. As stated in *Hills,* CGL polices are expected to cover liabilities incurred because of prior damage to property. *Hills,* 209 Wis. 2d at 183–84. We fail to see how the policy language signals clear limitations to the coverage afforded for these liabilities. As was well explained by the court of appeals in its decision in *Edgerton:*

> [O]nce property damage is found as a result of environmental contamination, cleanup costs should be recoverable as sums that the insured was liable to pay as the result of property damage. In this context the argument concerning the historical separation of damages and equity is not convincing . . . the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely third parties. While such claims might be

---

[34] As Johnson Controls correctly notes, categories three and four imply a type of "intentional wrongdoing" standard to the insured's actions. However, such an exception is entirely inappropriate because it does not ask whether the act giving rise to the coverage (the contamination) was intentional. *See Loveridge v. Chartier,* 161 Wis. 2d 150, 166, 468 N.W.2d 146 (1991) (discussing nature of intentional acts exclusion in insurance policy). This notion also erroneously assumes there is no good faith basis for the insured to contest liability under a government directive and fails to consider that CERCLA remediation actions are frequently complex and can involve innumerable permutations of factual situations.

characterized as seeking "equitable relief" the [cleanup] costs are essentially compensatory damages for injury to common property and for that reason the insured has a duty to defend. . . . [T]he short answer is that from the standpoint of the insured damages are being sought for injury to property. It is that contractual understanding rather than some artificial and highly technical meaning of damages which ought to control.

*City of Edgerton v. Gen. Cas. Co. of Wis.,* 172 Wis. 2d 518, 543, 493 N.W.2d 768 (Ct. App. 1992) (quoting *Upjohn Co. v. Aetna Cas. & Sur. Co.,* 768 F. Supp 1186, 1199–1200 (W.D. Mich. 1990)).

¶ 69. By determining that CERCLA response costs are recoverable under these CGL policies, we are not rendering the "as damages" phrase a mere surplusage. *Edgerton,* 184 Wis. 2d at 784 (citing *Shorewood,* 170 Wis. 2d at 369–70). On the contrary, the language of these CGL policies still precludes coverage for costs that the insured would pay in order to comply with general government regulations or prospective conduct. *See, e.g., A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.,* 475 N.W.2d 607, 625–26 (Iowa 1991); *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 625 A.2d 1021, 1033 (Md. 1993); *Minnesota Mining,* 457 N.W.2d 175, 180 n.4; *see also Wis. Power & Light Co. v. Century Indem. Co.,* 130 F.3d 787, 791 (7th Cir. 1997) ("A claim for damages must be distinguished from a demand for compliance with a legal duty.").

¶ 70. In deciding the *Edgerton* case, the court relied on two federal decisions to hold that CERCLA response costs are not "damages" under CGL policies. *Edgerton,* 184 Wis. 2d at 784 (citing *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348, 1352 (4th Cir. 1987) (applying Maryland law), *cert. denied,* 484 U.S. 1008 (1988), and *Cont'l Ins. v. Northeastern Pharm. & Chem.*

105

*Co.*, 842 F.2d 977 (8th Cir. 1988) (*NEPACCO*) (applying Missouri law), *cert. denied sub nom. Missouri v. Cont'l Ins. Cos.*, 488 U.S. 821 (1988)). The *Armco* and *NEPACCO* decisions have since been rejected by the highest courts of the states whose laws the decisions were attempting to apply. *See Farmland Indus., Inc. v. Republic Ins. Co.*, 941 S.W.2d 505, 512 (Mo. 1997); *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021 (Md. 1993).[35] This fact is not dispositive, but it erodes the credibility of the original *Edgerton* decision.

¶ 71. We conclude that the *Edgerton* decision was incorrect insofar as it relied on the too-confining, overly technical definition of "damages" in *Shorewood* and held that CERCLA response costs were not damages within the terms of the standard CGL policy.

B. Do PRP Letters Trigger the Insurer's Duty to Defend?

¶ 72. Having determined that CERCLA response costs for restoring and remediating contaminated property should have been determined to be "damages" under the relevant CGL policies, we turn to the other holding in *Edgerton:* that the receipt of a potentially responsible party (PRP) letter from the EPA, or a similar letter from a state agency, does not constitute a "suit" for which an insurer has a duty to defend.

---

[35] *NEPACCO* itself was a sharply divided Eighth Circuit en banc decision that reversed an earlier panel decision. *Cont'l Ins. Cos. v. Northeastern Pharm. & Chem. Co.*, 811 F.2d 1180 (8th Cir. 1987). The Eighth Circuit has subsequently rejected the rationale of the second *NEPACCO* decision. *See Lindsay Mfg. Co. v. Hartford Accident & Indem. Co.*, 118 F.3d 1263, 1270–71 (8th Cir. 1997) (predicting Nebraska law).

¶ 73. The *Edgerton* court stated the problem in the following manner:

> The expansive authority granted to state and federal agencies under CERCLA, in order to initiate environmental cleanup of hazardous waste, has had the effect of producing a flood of litigation so as to determine who will pay the cleanup costs—the PRP or the PRP's insurer. . . . [T]here has been no definitive, nationwide resolution of the ultimate issue—whether the general comprehensive liability policy—the "CGL"—imposes a duty to defend a federal or state demand for environmental remediation and cleanup costs. Instead, courts have developed competing definitions of what constitutes a "suit" when environmental cleanup is required.

*Edgerton,* 184 Wis. 2d at 766–68.

¶ 74. The court went on to observe that:

> Some courts have concluded that PRP letters have a unique nature within the context of a CERCLA administrative proceeding. These courts have held that the receipt of PRP letters is the "functional equivalent of a suit" because (a) the letters maintain a confrontational and adversarial posture, and (b) they create the spectre of devastating financial consequences if voluntary cooperation is not forthcoming. As a result, PRP liability for immediate and long-range cleanup and remediation costs necessitates a legal defense.

*Id.* at 770.

¶ 75. Then the court provided its own answer:

> We conclude that neither a PRP letter nor a comparable notification letter by a state agency such as the DNR triggers the insurers' duty to defend.
>
> . . . .

107

> [T]he primary attribute of a "suit" is that parties to an action are involved in actual court proceedings, initiated by the filing of a complaint. . . . [D]efinitions of suit or legal process all involve a court action.
>
> . . . .
>
> We find no ambiguity in the term "suit" as it has been used in the insurance policies. "Suit" denotes court proceedings, not a "functional equivalent." The dissent believes that a reasonable policyholder would view letters from a federal or state agency advising an insured of liability as a "suit." To the contrary, the word "suit" is easily understood and unambiguous to a reasonable policyholder. The proof is in the decisions that hold that a "PRP letter" is the "functional equivalent of a suit." Either there is a suit or there is not. When there is no suit, there is no duty to defend.

*Id.* at 771, 775, 781.

¶ 76. The *Edgerton* court's definition of "suit" gives us pause. An insurance policy is a contract between parties, and it is normally not the province of the court to enlarge the terms of a policy the parties have agreed upon. At the same time, the specific term being applied needs to be put in context.

¶ 77. Comprehensive general liability policies not only provide protection to insureds through indemnification for damages for which the insured becomes liable, but also for defense costs. John N. Bolus, *Contractual Liability Insurance Provisions: An Overview, in Reference Handbook on the Comprehensive General Liability Policy: Coverage Provisions, Exclusions, and Other Litigation Issues* 43 (Peter J. Neeson ed. 1995). A literal definition of the term "suit" in the CGL policy presents some practical difficulties in understanding

and reconciling the obligations of the parties in the presence of a CERCLA claim.

¶ 78. For instance, the CGL policy imposes duties upon the insured. The standard policy has long required that the insured provide notice to the insurer as soon as practicable. The 1973 version of the policy provides:

> In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

Dorothy Dey & Susan Ray, *Annotated Comprehensive General Liability Policy* § 3–1, 41 (1985).

¶ 79. A second provision of the CGL policy requires the insured to immediately forward process to the insurer: "If a claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." Dey, *supra,* at § 3–2, 44.

¶ 80. This CGL policy language is reinforced in Wisconsin by two statutes. *See* Wis. Stat. §§ 631.81, 632.26 (2001–02). These two sections "govern the notice provisions in Wisconsin insurance policies and set out the rights and duties of the insured and the insurer." *Neff v. Pierzina,* 2001 WI 95, ¶ 30, 245 Wis. 2d 285, 629 N.W.2d 177. They have been a part of Wisconsin law for more than a half-century.

¶ 81. A third provision in the CGL policy imposes a duty on the insured to cooperate in the event of an occurrence, claim, or suit:

> The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing the giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

Dey, *supra,* at § 3–3, 45.[36]

¶ 82. The CGL policy then addresses the insurer's duty to defend. The relevant clause in the policy provides that the insurer "shall have the right and duty to defend any suit against the insured seeking damages." This language appears to imply an equivalency between the insurer's "right" and the insurer's "duty." The insurer's "right" is partially defined in the previously noted duties imposed on the insured.

¶ 83. "[T]he duty to defend is generally acknowledged to be *broader than the insurance company's duty to pay . . . .*" Bolus, *supra,* at 43 (emphasis added).

---

[36] In *Chemical Applications Co., Inc. v. Home Indemnity Co.,* 425 F. Supp. 777 (D. Mass 1977), a pre-CERCLA case under the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1321(f)(2), the court decided that the insured's costs in cleaning up an oil spill in navigable waters was covered property damage. *Id.* at 778–79. It also concluded that the insured, who under governmental and public pressure cleaned up the spill without the insurer's prior consent, did not breach the "cooperation clause." Dorothy H. Dey, Defense Research Institute, *Annotated CGL Policy,* § 3–3, at 45 (1984).

"Generally, the duty to defend is *broader than the duty to indemnify*." Arnold P. Anderson, *Wisconsin Insurance Law* 212 (3d ed. 1990) (citing *Colton v. Swain*, 527 F.2d 296 (7th Cir. 1975)) (emphasis added).

¶ 84. When the CGL policy requires and the insurer insists upon notice and cooperation from the insured, and when the insurer's duty to defend is generally broader than its duty to pay, how is the insurer entitled to assert that it has no duty to defend until an actual suit has been filed? When an insurer has received a copy of the insured's PRP letter, it has become familiar with the nature of the claim. Faced with a PRP letter, which can lead to drastic consequences, including higher costs, and which has been shared with the insurer, the reasonable insured is likely to *expect* reciprocal cooperation from the insurer in the form of a defense.

¶ 85. A tender of defense occurs when the insurer has notice that there is a claim against the insured. *Towne Realty, Inc. v. Zurich Ins. Co.*, 201 Wis. 2d 260, 264, 548 N.W.2d 64 (1996). "A tender of defense occurs once an insurer has been put on notice of a claim against the insured. This approach 'discourages the insurer . . . from defaulting in the performance of its duty to defend.' " *Id.* at 267 (quoting *White Mountain Cable Constr. v. Transamerica*, 631 A.2d 907, 910 (N.H. 1993)). "If there is any doubt about the duty to defend, it must be resolved in favor of the insured." *Towne Realty*, 201 Wis. 2d at 269 (quoting *Shorewood*, 170 Wis. 2d at 364). In short, we might look at the language of the CGL policy and conclude that, in the context of a PRP letter from the EPA or a similar letter from a state agency, a reasonable person in the position of the insured would expect the insurer to provide a defense.

¶ 86. As *Edgerton* noted, other courts have attacked the problem in a different way after analyzing the unique system of liability under CERCLA. CERCLA was designed not only to require that responsible parties pay for the costs of responding to contaminated property but also to encourage parties to undertake these remediation efforts without litigation and in conjunction with other PRPs for the particular site at issue. *See* 42 U.S.C. § 9622(a), (e). The EPA's practice is to use PRP letters to achieve the goal of remediating environmental contamination, rather than to bring suit immediately upon identifying a polluter. *See EDO Corp. v. Newark Ins. Co.,* 898 F. Supp. 952, 960 (D. Conn. 1995). Of course, nothing prohibits the EPA from remediating properties itself and then commencing a cost recovery action naming the insured. In these circumstances, the "suit" condition has undoubtedly been met.

¶ 87. The existence of a statutory system designed to forgo litigation, while achieving the same relief, minimizes the distinction between administrative claims and formal legal proceedings. *See Aetna Cas. & Sur. Co. v. Pintlar Corp.,* 948 F.2d 1507, 1517 (9th Cir. 1991) ("Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation.").[37]

¶ 88. Because of this strong policy in favor of cooperative remediation over litigation, CERCLA provides within its enforcement mechanism significant incentives for prompt and full involvement from all contacted PRPs. Failure to actively engage the EPA

---

[37] We strictly limit our conclusion regarding the triggering effect of a PRP letter on a CGL insurer's duty to defend to the CERCLA context.

following a PRP letter can lead to such adverse consequences as (1) large fines that may include treble punitive damages; (2) an inadequate administrative record affecting the insured's interests; (3) use of the insured's non-compliance against the insured in the apportionment of cleanup costs in subsequent litigation; (4) forfeiture of special rights against latter actions for contribution of response cost payments; and (5) other parties (including perhaps the EPA) cleaning up the site at a higher cost, which will latter be demanded of the insured. *See Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278, 1308 (D. Utah 1994); *see also Pintlar*, 948 F.2d at 1516; *Mich. Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864, 872 (Mich. 1994).

¶ 89. PRP notice letters expose an insured to agency action that is not inconsequential to its liability interests. In this case, if Johnson Controls had refused to respond to these letters and refused to become involved in remediation efforts with the EPA or comparable state agencies, then, inevitably, the cleanup and remediation work would have been done by the EPA, the state agencies, or by settling responsible parties, any of whom could have sued Johnson Controls for its share of the costs. PRP letters, which are more analogous to a civil complaint than a traditional demand letter, alerted Johnson Controls that the EPA had begun a legal process to conclusively and legally determine the appropriate "response activities" that liable parties must perform or pay for to abate the pollution at the sites in question. *See Pintlar*, 948 F.2d at 1516; *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 555 N.E.2d 576, 581 (Mass. 1990).

¶ 90. This is why many courts have concluded that a PRP letter is so adversarial that it constitutes the

functional equivalent of a suit and triggers the insurer's duty to defend. In the absence of such a conclusion, the insured has a perverse incentive not to cooperate with government remedial actions until the EPA or a state agency files a civil action in court "to force the insured's compliance with CERCLA." *Quaker State,* 868 F. Supp. at 1307. Deliberate non-compliance for the purpose of obtaining a defense from the insurer is completely contrary to public policy.

¶ 91.　In her dissent in *Edgerton,* Justice Abrahamson wrote:

> From the point of view of a reasonable policy holder, official letters from a federal or state agency advising an insured of liability, with increasing penalties if the insured does not respond, appear to be an adversary's attempt to gain an end by a legal process. Such administrative proceedings may force the insured to hire technical experts and lawyers to protect its interests and may terminate in an action in court. Thus to the insured an administrative action is as coercive a legal process as an action filed in a court of law.

*Edgerton,* 184 Wis. 2d at 789 (Abrahamson, J., dissenting). This analysis supports both a reasonable-expectation-of-the-insured theory and a functional-equivalent-of-a-suit theory.

¶ 92.　We conclude that insurers have a duty to defend an insured who receives a PRP letter from the EPA or an equivalent state agency seeking remediation or remediation costs, provided the insured has coverage for the claim under the CGL policy. As noted above, CERCLA response costs are not excluded by the "as damages" clause but may be excluded by other provisions of the policy.

¶ 93. We have articulated several reasons why we believe that *Edgerton* incorrectly applied Wisconsin law on insurance contracts and remedies, misconstrued the nature of CERCLA liability, and, thereby, erroneously denied coverage to policyholders of standard CGL policies. Nevertheless, it is not sufficient for this court merely to explain why we disagree with the *Edgerton* decision and reach a contrary conclusion. Our duty is particularly clear here, because numerous litigants in Wisconsin have previously had coverage disputes determined under the principles set out in *Edgerton*. Overruling *Edgerton* requires a compelling justification. *See State v. Outagamie County Bd. of Adjustment,* 2001 WI 78, ¶ 71, 244 Wis. 2d 613, 628 N.W.2d 376 (Crooks, J., concurring). We conclude that such a justification exists.

A. Stare Decisis

¶ 94. This court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law. *See City of Akron v. Akron Ctr. for Reprod. Health, Inc.,* 462 U.S. 416, 419–20 (1983). We understand that respect for prior decisions is fundamental to the rule of law. We recently summarized this court's adherence to the doctrine, stating:

> Fidelity to precedent ensures that existing law will not be abandoned lightly. When existing law "is open to revision in every case, 'deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.' " Consequently, this court has held that "any departure from the doctrine of stare decisis demands special justification."

*Schultz v. Natwick,* 2002 WI 125, ¶ 37, 257 Wis. 2d 19, 653 N.W.2d 266.[38] "A court's decision to depart from precedent is not to be made casually. It must be explained carefully and fully to insure that the court is not acting in an arbitrary or capricious manner. A court should not depart from precedent without sufficient justification." *State v. Stevens,* 181 Wis. 2d 410, 442, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring).

¶ 95. The rationales for following the doctrine of stare decisis are familiar. They include:

> the desirability that the law furnish a clear guide for conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; [2] the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and [3] the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.

*Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 403 (1970). "Stare decisis is the preferred course of judicial action because it promotes evenhanded, predictable, and consistent development of legal principles . . . and contributes to the actual and perceived integrity of the judicial process." *State v. Ferron,* 219 Wis. 2d 481, 504, 579 N.W.2d 654 (1998) (quoting *Payne v. Tennessee,* 501 U.S. 808, 827 (1991)). The decision to overturn a prior

---

[38] Citing, respectively: *State v. Stevens,* 181 Wis. 2d 410, 441, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring), *cert. denied,* 515 U.S. 1102 (1995); *State v. Outagamie County Bd. of Adjustment,* 2001 WI 78, ¶ 29, 244 Wis. 2d 613, 628 N.W.2d 376 (quoting *Citizens Util. Bd. v. Klauser,* 194 Wis. 2d 484, 513, 534 N.W.2d 608 (1995) (Abrahamson, J., dissenting)); *State v. Ferron,* 219 Wis. 2d 481, 504, 579 N.W.2d 654 (1998) (quoting *Arizona v. Rumsey,* 467 U.S. 203, 212 (1984)).

case must not be undertaken merely because the composition of the court has changed. *See Stevens,* 181 Wis. 2d at 442 (Abrahamson, J., concurring) (citing *Welch v. State Farm Mut. Auto. Ins.,* 122 Wis. 2d 172, 182, 361 N.W.2d 680 (1985) (Steinmetz, J., dissenting)). In addition, frequent and careless departure from prior case precedent undermines confidence in the reliability of court decisions. *See State v. Lindell,* 2001 WI 108, ¶ 169, 245 Wis. 2d 689, 629 N.W.2d 223 (Abrahamson, C.J., dissenting).[39] The reasons for rejecting any established rule of law must always be weighed against these factors.

■

¶ 96. At the same time, there are particular circumstances in which a jurisdiction's highest court should not be barred from pursuing a sound and prudent course for the sake of upholding its prior precedent. Although special justification is required to overturn prior decisions, *see, e.g., Dickerson v. United States,* 530 U.S. 428, 443 (2000); *Hilton v. South Carolina Pub. Rys. Comm'n,* 502 U.S. 197, 202 (1991), justification can be divined in the appropriate circumstances. *See Cook v. Cook,* 208 Wis. 2d 166, 186, 560 N.W.2d 246 (1997) ("stare decisis contemplates that under limited circumstances a court may overrule outdated or erroneous holdings"). Consequently, stare de-

---

[39] As this court has stated, "When legal standards 'are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.' " *State v. City of Oak Creek,* 2000 WI 9, ¶ 55 n.27, 232 Wis. 2d 612, 605 N.W.2d 526 (quoting *Appeal of Concerned Corporators of Portsmouth Savings Bank,* 525 A.2d 671, 701 (N.H. 1987) (Souter, J., dissenting) (quoting *Thornburgh v. Am. College of Obstetricians & Gynecologists,* 476 U.S. 747, 786–87 (1986) (White, J., dissenting))).

cisis is not a mechanical formula for adherence to the latest decision, *Payne,* 501 U.S. at 828, and "the power of the court to repudiate its prior rulings is unquestioned, though not often exercised." *Schwanke v. Garlt,* 219 Wis. 367, 371, 263 N.W. 176 (1935).

¶ 97. In all, stare decisis is a principle of policy, not an inexorable command. *Hohn v. United States,* 524 U.S. 236, 251 (1998).[40] It reflects a policy judgment that "in most matters it is more important that the applicable rule of law be settled than that it be settled right." *Agostini v. Felton,* 521 U.S. 203, 235 (1997) (quoting *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting)).

¶ 98. With this understanding of our responsibility as a judicial institution, we inquire into the circumstances that satisfy the demanding standards for departing from precedent. There are several familiar criteria in Wisconsin for overturning prior cases. *Stevens,* 181 Wis. 2d at 442 (Abrahamson, J., concurring). First, changes or developments in the law have undermined the rationale behind a decision. *Id.* Second, there is a need to make a decision correspond to newly ascertained facts. *Id.* Third, there is a showing that the precedent has become detrimental to coherence and consistency in the law. *Id.*

¶ 99. Among the additional relevant considerations in determining whether to depart from stare decisis are whether the prior decision is unsound in principle, whether it is unworkable in practice, and

---

[40] *See also, e.g., State Oil Co. v. Khan,* 522 U.S. 3, 20 (1997); *Payne v. Tennessee,* 501 U.S. 808, 828 (1991).

whether reliance interests are implicated. *Allied-Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. 768, 783 (1992); *see also Planned Parenthood of S.E. Pa. v. Casey,* 505 U.S. 833, 854–55 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.). As noted by the lead opinion in *Outagamie County,* 244 Wis. 2d 613, the decision to overrule a prior case may turn on whether the prior case was correctly decided and whether it has produced a settled body of law. *Id.,* ¶ 30 (citing *Casey,* 505 U.S. at 999 (Scalia, J., concurring in part and dissenting in part)).

¶ 100. It is not a sufficient reason for this court to overrule its precedent that a large majority of other jurisdictions, with no binding authority on this court, have reached opposing conclusions.[41] This court has no

---

[41] For state cases that have held contrary to *Edgerton,* see *Alabama Plating Co. v. U.S. Fid. & Guar. Co.,* 690 So.2d 331 (Ala. 1996); *Compass Ins. Co. v. City of Littleton,* 984 P.2d 606 (Colo. 1999); *Atlantic Wood Indus., Inc. v. Lumbermen's Underwriting Alliance,* 396 S.E.2d 541 (Ga. App. 1990); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 607 N.E.2d 1204 (Ill. 1992); *Hartford Accident & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285 (Ind. App. 1997); *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.,* 475 N.W.2d 607 (Iowa 1991); *Aetna Cas. & Sur. Co. v. Nuclear Eng'g Co.,* 2002 WL 363373 (Ky. App. 2002) (opinion not yet final); *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 625 A.2d 1021 (Md. 1993); *Hazen Paper Co. v. U.S. Fid. & Guar. Co.,* 555 N.E.2d 576 (Mass. 1990); *U.S. Aviex Co. v. Travelers Ins. Co.,* 336 N.W.2d 838 (Mich. App. 1983); *Minn. Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175 (Minn. 1990); *Farmland Indus., Inc. v. Republic Ins. Co.,* 941 S.W.2d 505 (Mo. 1997); *Coakley v. Maine Bonding & Cas. Co.,* 618 A.2d 777 (N.H. 1992); *Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am.,* 629 A.2d 831 (N.J. 1993); *C.D. Spangler Const. Co. v. Indus. Crankshaft & Eng'g Co., Inc.,* 388 S.E.2d 557 (N.C.

1990); *Sanborn Plastics Corp. v. St. Paul Fire & Marine Ins. Co.*, 616 N.E.2d 988 (Ohio App. 1993); *Lane Elec. Coop., Inc. v. Federated Rural Elec. Ins. Corp.*, 834 P.2d 502 (Or. App. 1992); *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507 (Wash. 1990); *Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724 (Wyo. 1988).

In addition to these state court decisions, numerous federal courts, applying state law, have also determined that CERCLA response costs are "damages" under liability insurance policies. *See Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023 (2d Cir. 1991) (applying Vermont law); *SnyderGeneral Corp. v. Century Indem. Co.*, 113 F.3d 536 (5th Cir. 1997) (applying Texas law); *Lindsay Mfg. Co. v. Hartford Accident & Indem. Co.*, 118 F.3d 1263 (8th Cir. 1997) (applying Nebraska law); *Aetna Cas. & Sur. Co., Inc. v. Pintlar Corp.*, 948 F.2d 1507 (9th Cir. 1991) (applying Idaho law); *MAPCO Alaska Petroleum, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 795 F. Supp. 941 (D. Alaska 1991); *Chesapeake Utils. Corp. v. Am. Home Assur. Co.*, 704 F. Supp. 551 (D. Del. 1989); *Potomac Elec. Power Co. v. Cal. Union Ins. Co.*, 777 F. Supp. 968 (D. D.C. 1991); *GAF Corp. v. Cont'l Cas. Co.*, 1989 WL 1761 (E.D. La. 1989); *Nat'l Indem. Co. v. U.S. Pollution Control, Inc.*, 717 F. Supp. 765 (W.D. Okla. 1989); *Fed. Ins. Co. v. Susquehanna Broad. Co.*, 727 F. Supp. 169 (M.D. Pa. 1989); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278 (D. Utah 1994); *Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F. Supp. 2d 422, 434 (E.D. Va. 2000).

Presently, only the Supreme Courts of Maine and California maintain a result somewhat consistent with that of *Edgerton*, whereby CERCLA response costs are not considered "damages" under CGL policies. However, even the courts in these states, while reaching the same result of denying coverage as found in *Edgerton*, have not followed the rationale of *Edgerton*. When Maine reached its conclusion that the phrase "as damages" in CGL policies did not include CERCLA response costs, it relied in part on that state's prior legal conclusion that such language would not cover the costs of punitive damages. *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16, 19 n.8 (Me. 1990).

apprehension about being a solitary beacon in the law if our position is based on a sound application of this state's jurisprudence. But when our light is dim and fading, then this court must be prepared to make correction. Stare decisis is neither a straightjacket nor an immutable rule. *See Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.,* 215 F.3d 136, 142 (1st Cir. 2000). We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision.

## B. Stare Decisis and *Edgerton*

¶ 101. Given these principles of stare decisis and the criteria for permitting deviation from the doctrine, we conclude that the *Edgerton* decision cannot remain the law. In applying the criteria for contravening stare

Wisconsin courts have held to the contrary on the issue of whether punitive damages are covered "damages" under a CGL policy, unless explicitly excluded. *See Brown v. Maxey,* 124 Wis. 2d 426, 443, 369 N.W.2d 677 (1985).

California law has struggled with the issues at play in this case. *See Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.,* 959 P.2d 265 (Cal. 1998); *AIU Ins. Co. v. Superior Court,* 799 P.2d 1253 (Cal. 1990); *Aerojet-General Corp. v. Superior Court,* 257 Cal. Rptr. 621 (Cal. Ct. App. 1989). In a 2001 decision, the California Supreme Court reached the somewhat unique conclusion that CERCLA response costs are not covered because, since there is no duty to defend without a formal suit and because the duty to defend is broader than the duty to indemnify, there can be no duty to defend if there is no duty to indemnify. *Certain Underwriters at Lloyd's of London v. Superior Court,* 16 P.3d 94, 102 (Cal. 2001). This decision apparently encourages insureds to wait and be sued before remediating property, if they wish to receive liability insurance coverage.

decisis, we note that many of the reasons given earlier in this opinion explain why *Edgerton* must be overruled.

¶ 102. We first observe that the present case is not solely about *Edgerton.* It is about the interplay of *Edgerton* with our subsequent unanimous decision in *Hills.* The categories established in *Johnson Controls I* are derivative of these two decisions and the conflict between them. Although *Hills* purported to retain *Edgerton* in its totality, it severely undercut the rationale by which the *Edgerton* court denied relief to insureds in circumstances quite comparable to those in *Hills.*

¶ 103. *Edgerton* held without qualification that CERCLA response costs aimed at remediating contaminated property do not constitute damages for which coverage is required under standard CGL policies. *Edgerton,* 184 Wis. 2d at 782. Three years later, this court held in *Hills* that an insurer must defend an action against its insured by a third party seeking to recover costs it expended under CERCLA to clean up land that had been damaged by the insured. *Hills,* 209 Wis. 2d at 185. In reaching this latter conclusion, we clearly stated: "It has long been the law of this state that the cost of repairing and restoring damaged property and water to its original condition is a proper measure of compensatory damages. ... The passage of CERCLA and similar state statutes has not changed the law of remedies." *Id.* at 181–82. As a result of this holding, an insured's liability for certain CERCLA response costs *were* deemed to be "damages" under a standard CGL policy. *Hills* recast the nature of the relief sought in actions involving CERCLA response costs. This recasting correctly perceived the nature of liability in these

cases, but was squarely at odds with *Edgerton*'s misapplication of Wisconsin law on the remediation of damaged property.

¶ 104. *Hills'* correction of *Edgerton* was complemented by another consideration. *Hills* heeded the reasonable expectations of the insured when it assessed whether the damages at issue were covered under the CGL policies. *Hills*, 209 Wis. 2d at 183–84; *see also Johnson Controls II*, 250 Wis. 2d 319, ¶ 17 n.4. In contrast to *Edgerton*, the *Hills* court stated:

> [B]ecause liability policies are intended to protect insureds from negligent acts resulting in damage to third parties, "an insured, when buying comprehensive general liability coverage, expects that *any* activity resulting in unintended and unexpected . . . property damage to a third party will be covered unless it is specifically excluded."

*Id.* at 184 (quoting Robert D. Chesler et al., *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Site Liability,* 18 Rutgers L.J. 9, 69–70 (1986), with emphasis added by the *Hills* opinion).

¶ 105. Still, *Hills* openly endeavored to retain *Edgerton*'s holdings in some manner. *Hills*, 209 Wis. 2d at 180, 182, 185. However, in straining to preserve *Edgerton, Hills* only deferred the inevitable decision this court makes today. In one sense, therefore, the decision to overrule *Edgerton* is eased by the clear conclusion that *Hills* and *Edgerton* cannot be reconciled without generating the arbitrary and illogical distinctions discussed earlier in this opinion. As a practical matter, if we do not remove or limit the force of *Edgerton,* we must remove or limit the force of

*Hills.*[42] Because *Hills* undermined the doctrinal under-pinnings of *Edgerton,* the prior decision is more apt to be overruled. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 173 (1989).

¶ 106. Perhaps the most damning factor weighing against our continued adherence to *Edgerton* is its failure to provide suitable direction and consistency to this area of the law. Without this consistency, one of the primary justifications for adhering to stare decisis dis-solves. *See City of Milwaukee v. Firemen's Relief Ass'n of City of Milwaukee,* 42 Wis. 2d 23, 37–38, 165 N.W.2d 384 (1969) ("the state of precedent on this subject is so contradictory that we conclude ... that the diverse nature of past holdings leaves us free to repudiate the less desirable rulings and from the obligation to deter-mine this case solely on the basis of stare decisis").

¶ 107. Nonetheless, the insurers claim that *Hills* coherently established a principle whereby a reasonable insured would expect coverage for actions brought by

---

[42] *Hills'* inconsistency with *Edgerton* is witnessed by a statement from one commentator who, while lauding the *Edgerton* decision shortly after it was made, failed to correctly predict the outcome in *Hills.* According to this commentator:

> Since *Edgerton* analyzed the nature of the relief, its holding is not limited solely to landfill cases under CERCLA or equivalent state statutes. Nor is it limited to government-ordered cleanups. Rather, the holding applies to all environmental cases involving restitu-tionary or injunctive relief *regardless of whether the suit is brought by the government or a third-party as a claim for contribution.*

Heidi L. Vogt, *City of Edgerton v. General Casualty Company of Wisconsin: A Landmark Decision in Wisconsin Insurance Coverage Law,* 68 Wis. Law. 10, 12 (May 1995) (emphasis added). *Hills* later clearly held to the contrary of this reasonable forecast with respect to a third-party suit for contribution of CERCLA response cost payments.

non-governmental third parties but would not expect coverage for actions brought by the government, even if both actions were to command the insured to perform the same repairs or make the same payments to remediate the same damaged property. They point to the following language from *Hills:*

> [A] reasonable insured in the position of Hills would interpret the phrase "as damages" to include coverage for a claim, *brought by parties other than the EPA or DNR,* which obligates him or her to pay monetary sums because of the negligent contamination of property that does not fit within the owned-property exclusion, since this is the very reason that an individual purchases liability coverage.

*Hills,* 209 Wis. 2d at 185 (emphasis added). In making this statement, *Hills* did not conclude that the nature of the relief sought changes based on the identity of the party bringing the action. The opinion merely concluded that the DNR and EPA, when parties in a CERCLA cost recovery action, are somehow different from other parties. This observation, for the reasons discussed above, is not tenable as a rule of law. There is a logical inconsistency in granting coverage for the so-called "category two" cases (*Hills*) while not finding coverage in the remaining three categories. To the extent there is any coherence or workability, it is the function of following an arbitrary distinction unsupported by the law, by logic, or by the language of the policies.

¶ 108. In *Wilcox v. Wilcox,* 26 Wis. 2d 617, 133 N.W.2d 408 (1965), this court overruled *Bain v. Northern Pacific Railway Co.,* 120 Wis. 412, 98 N.W. 241 (1904), and succeeding cases which had held that the proper choice of law rule in Wisconsin is invariably lex

loci delicti.[43] The reasoning the court used to alter the rule previously established by these cases has a striking parallel to the reasoning in this case. In *Wilcox,* we noted that the rule of lex loci had not produced certainty of result, such that "hard cases [ ] produced deviations from the rule." *Wilcox,* 26 Wis. 2d at 622. Continuing, the court opined:

> It appears therefore that lex loci has not provided a "fixed star" but rather has been merely a point of departure in hard cases. . . . "[C]ontinued adherence to a bad rule is a high price to pay for predictability. Furthermore, it is doubtful whether a bad rule will provide predictability since the courts will be inclined to engraft exceptions upon it."

*Id.* at 624–25 (quoting Willis Reese, *Comments on Babcock v. Jackson,* 63 Colum. L. Rev. 1251, 1254 (1963)).

¶ 109. As did *Bain* in the context of choice of law theories, *Edgerton* "has not produced the certainty that stare decisis contemplates," *Wilcox,* 26 Wis. 2d at 625, in the context of CGL insurance coverage for CERCLA liability. *See* Stuart, *supra,* at 876 (1997) ("criticisms [of *Edgerton*] lead to a movement in the Wisconsin appellate courts to restrict the application of the decision to the facts of the case"). Not only are the now-dispositive factual issues in these cases arbitrary, but the rule seems to generate a tertiary level of questions yet to be resolved by the courts. First, "Did the [*Hills*] court

---

[43] Lex loci delicti is a choice of law principle in tort cases which states that the right to bring an action vests at the place of injury, and courts therefore should apply the law of that place. *See* Shirley A. Wiegand, *Officious Intermeddling, Interloping Chauvinism, Restatement (Second), and Leflar: Wisconsin's Choice of Law Melting Pot,* 81 Marq. L. Rev. 761, 761 (1998).

intentionally distinguish between receiving a letter from the EPA or DNR and being sued by the EPA or DNR when it stated, '*Edgerton* continues to stand for the proposition that receipt of a letter from the EPA or DNR requesting a party to propose a remediation plan does not constitute a suit seeking damages'?" Todd M.W. Turall, *If at First You Don't Succeed . . . Change the Facts?: New Hope for Insureds Seeking Defense and Indemnification from Insurance Companies for Environmental Cleanup Costs,* 6 Wis. Envtl. L.J. 119, 139 (1999). Second, what type of contact by a government agency must occur and what must the subject matter of the contact be in order to alter the insured's rights to liability coverage under its CGL policies? Third, does it matter whether the insured fully complied with a government directive that does not request immediate remedial action, and then the insured is sued in a cost recovery action? Fourth, what if a portion of third-party response costs is incurred before an insured received a cleanup demand relating to that property? Fifth, can an insured ever have a good faith basis for contesting liability and, on that basis, refuse to take immediate action? These questions, and perhaps many more, are the offspring of the *Edgerton/Hills* system, at least as interpreted by the court of appeals.

¶ 110. While the insurers and several amici curiae arguing before this court fervently maintain that court of appeals and circuit court decisions exhibit an ease reconciling the *Hills* decision with *Edgerton,* the cases themselves belie that notion. The court of appeals has not been uniform in its interpretation and application of *Edgerton* and *Hills*.[44] In fact, judges on the court of

---

[44] *Compare Robert E. Lee & Assocs., Inc. v. Peters,* 206 Wis. 2d 509, 521, 557 N.W.2d 457 (Ct. App. 1996) ("the effect of

appeals have been forced to speculate over any congruence between the two decisions, without accomplishing any conclusive reconciliation. In *Johnson Controls II,* the court of appeals remarked that while *Hills'* attempted harmonization with *Edgerton* "may seem like somewhat of an arbitrary distinction to some, this is the law set by our supreme court and we are obligated to apply this law." *Johnson Controls II,* 250 Wis. 2d 319, ¶ 17. The court then surmised, "It is interesting to note

*Edgerton* is not to deny any and all coverage to an insured whenever a case involves contaminated property"); *Sauk County,* 202 Wis. 2d at 442 ("We are not persuaded by [the insurer's] argument that because the counterclaims are premised upon contribution and indemnification theories, that the counterclaims seek merely equitable relief, which does not constitute damages pursuant to *Edgerton.*"); *Spic & Span, Inc. v. Cont'l Cas. Co.,* 203 Wis. 2d 118, 127, 552 N.W.2d 435 (Ct. App. 1996) (finding that insurers had duty to defend and indemnify insured that previously occupied and controlled contaminated land for which third-parties later sued insured to recover costs of remediating that property), *with State v. Hydrite Chem. Co.,* 2002 WI App 222, ¶ 25, 257 Wis. 2d 554, 652 N.W.2d 828 (denying liability insurance coverage for public nuisance claim from DNR seeking monetary damages for pollution from insured because the substance of the relief sought was to compel insured to pay for cleanup); *Amcast Indus. Corp. v. Affiliated FM Ins. Co.,* 221 Wis. 2d 145, 160–62, 584 N.W.2d 218 (Ct. App. 1998) (finding that *Edgerton* precluded coverage and that fundamental difference between *Edgerton* and *Hills* is not based on the ownership of the property in question but rather on whether there is a third-party claim); *Hydrite Chem. Co. v. Aetna Cas. & Sur. Co.,* 220 Wis. 2d 26, 37–39, 582 N.W.2d 423 (Ct. App. 1998) (same); *Regent Ins. Co. v. City of Manitowoc,* 205 Wis. 2d 450, 461, 556 N.W.2d 405 (Ct. App. 1996) ("Under . . . *City of Edgerton,* an action seeking recovery of past response costs incurred by federal and state governments is not an action seeking damages.").

that the difference in outcome between *Edgerton* and *Hills* may have resulted in part because in *Edgerton,* the supreme court failed to consider the expectations of the insured; whereas in *Hills,* such expectation was afforded generous consideration." *Id.,* ¶ 17 n.4. Alternatively, Judge Roggensack, in her dissent in *Hydrite Chemical Co. v. Aetna Casualty & Surety Co.,* 220 Wis. 2d 26, 582 N.W.2d 423 (Ct. App. 1998), suggested that *Hills* required only an analysis of whether the claims arose out of damage to third-party property or to the insured's owned property, with only the latter scenario being not indemnified under the CGL policies. *Id.* at 44–45 (Roggensack, J., dissenting).[45]

¶ 111. The confusion generated by *Edgerton* and *Hills* has been noticed nationally. In one treatise discussing how various jurisdictions have answered the question of whether cleanup costs under CERCLA are "damages" coverable under CGL policies, the authors describe the surprise to the legal community caused by the *Edgerton* decision. 1 Tod I. Zuckerman & Mark C. Raskoff, *Environmental Insurance Litigation: Law and Practice,* § 3:6, at 3–182 (1996 & Supp. 2002). Speaking with candor (and in stark contrast to their less-editorial remarks concerning the law in other jurisdictions), the authors appraised the situation as follows:

> Since the Wisconsin Supreme Court's 1994 decision in *City of Edgerton v General Casualty Co.* Wisconsin law on the issue of whether cleanup costs are "damages" because of "property damage" *has been quite confusing.* . . . Thereafter, the Wisconsin Supreme Court itself

---

[45] *See also Sauk County,* 202 Wis. 2d at 441 (interpreting *Edgerton* and *Hills* as basing coverage on whether the costs are related to the contaminated property the party owns versus third-party property).

began to limit the effect of its ruling in *City of Edgerton.* As a result, in Wisconsin there is coverage for *certain types* of cleanup expenses.

*Id.* at 3-183 (emphasis added). The commentators then proceed to discuss the four-category system articulated by the court of appeals in *Johnson Controls I* and *Johnson Controls II.* We agree with this objective assessment of the uncertainty that has developed post-*Edgerton* in Wisconsin on this issue of law.

¶ 112. By overruling *Edgerton*'s conclusion on the "as damages" language and adopting the *Hills* rationale, we will rectify the present confusion and arbitrariness surrounding CERCLA cost recovery actions in Wisconsin, while heading off some of the troubling issues still on the horizon. The resulting rule should be clear, comprehensive, and logical: The liability imposed under CERCLA against an insured who has contributed to the contamination of property is covered "as damages" if the costs to satisfy that liability are expended to remediate, or pay for the remediation of, the damaged property, provided that the costs are not excluded by some other provision of the policy.

¶ 113. We note the nature of the conduct underlying these types of actions because it bears on another consideration. As a general rule, courts will depart from stare decisis only where unintentional conduct is involved. *See Gottlieb v. City of Milwaukee,* 33 Wis. 2d 408, 431, 147 N.W.2d 633 (1967). "The rules of stare decisis attempt to give certainty to our law, so conduct can be planned in light of foreseeable legal consequences. Certainty, however, is less relevant in the law of unintentional torts, where conduct is not planned,

130

than in the law of contracts or, more particularly, in the law of real property." *Wilcox,* 26 Wis. 2d at 622.

¶ 114. The conduct underlying the legal issues in this case involves unintentional conduct in two primary ways. First, CERCLA liability is a particular breed of strict liability *and* is retroactive without apparent limitation. In other words, CERCLA imposes liability on persons who may not have been doing anything unlawful at the time they caused the contamination. They may, in fact, have been using state-of-the-art technologies to protect against environmental damage. Liability can also be imposed on those who did not cause contamination, but merely owned the land.[46]

¶ 115. Second, CGL policies were designed precisely to cover known *and unknown* hazards. *See, e.g., A.Y. McDonald,* 475 N.W.2d at 621 (citing Jordan S. Stanzler & Charles A. Yuen, *Coverage for Environmental Cleanup Costs: History of the Word "Damages" in the Standard Form Comprehensive General Liability Policy,* 1990 Colum. Bus. L. Rev. 449, 462–65). It is thus mistaken to argue that insureds such as Johnson Controls never bargained or paid for premiums to cover the costs of complying with the unique liability scheme of

---

[46] *See Town of Wallkill v. Tesa Tape Inc.,* 891 F. Supp. 955, 961 (S.D.N.Y. 1995) ("the policy of CERCLA [is] to make generators pay their share of the cleanup costs, regardless of whether their actions were lawful at the time their hazardous materials were disposed of at the landfill"); John Copeland Nagle, *CERCLA'S Mistakes,* 38 Wm. & Mary L. Rev. 1405, 1446 & n.218 (1997); Elizabeth Ann Glass, *Superfund and SARA: Are There Any Defenses Left?,* 12 Harv. Envtl. L. Rev. 385, 430 (1988) ("CERCLA represents a change in the traditional concept of strict liability. The common law defenses to strict liability, such as state-of-the-art or lawful act at the time undertaken, are not available to CERCLA defendants.").

CERCLA.[47] CGL policies are identified by their comprehensive and inclusive nature. When CERCLA was adopted, it created strict liability not based on fault, made responsible parties joint and severally liable, and imposed liability retroactively. Therefore, neither insurers nor insureds could have bargained over coverage for the specific liability that would be imposed under such a system.

¶ 116. There has not been such a mass of public and private business transacted in accordance with *Edgerton* that we need to abide by stare decisis. *See United States v. Maine,* 420 U.S. 515, 527 (1975). We are mindful of the reliance interests of businesses, insurance companies, previous litigants (both actual and potential), and numerous others that have arisen due to this court's holding in *Edgerton.* We recognize that circuit courts and the court of appeals in this state have faithfully applied the holdings of *Edgerton*—in particular the conclusion that "damages" do not mean CERCLA

---

[47] Similarly, Johnson Controls insurers should not be heard to argue that coverage is precluded under these policies because it was Johnson Controls' business decisions and actions that caused the pollution for which their liability arises. Such logic would work to nullify the validity of any coverage for unknown hazards and liabilities. The whole purpose of comprehensive general liability policies is to "shift the risk of unanticipated hazards from the policyholder to the insurer." Mark S. Parris & Rodney B. Younker, *The "As Damages" Clause Under Washington Law: Holding Insurers to Their Bargain,* 28 Gonz. L. Rev. 609, 621–22 (1992–93). Congress, by enacting CERCLA, decided to retroactively impose costly liability on groups of persons who did not anticipate this type of liability. The only question is which group of unsuspecting potential payees of these cost (insureds or their insurers) must ultimately pay for this liability? The answer to this inquiry is strictly one of contractual construction.

132

response costs—to the best of their ability, and that numerous cases have been decided with these principles. Because the meaning of insurance contract terms should remain settled whenever possible, we are generally disinclined to reverse prior interpretations of these terms.

¶ 117. However, the CGL's treatment of CERCLA claims presents unusual, if not unique, policy construction problems, which justify this court's deviation from general principle. Most, if not all, CGL policies executed today will not be governed by either this decision *or* by *Edgerton*. The CGL policy language at issue in this case was drafted long ago and has since been rendered largely inapplicable in the context of CERCLA actions. Beginning in 1985, insurance companies revised their standardized CGL policies to include absolute pollution exclusions from coverage.[48] This revision followed on the heels of over a decade of coverage periods in which CGL policies had included limited pollution exclusion clauses. *See Peace v. Northwestern Nat. Ins. Co.*, 228 Wis. 2d 106, 141, 596 N.W.2d 429 (1999) (explaining this evolution in CGL policy language related to pollution exclusions); *see also* Jim L. Julian & Charles L. Schlumberger, *Insurance Coverage for Environmental Clean-up Costs Under Comprehensive General Liability Policies,* 19 U. Ark. Little Rock L. Rev. 57, 58–59 (1996). The CGL policies given effect in this case are no longer being marketed, *nor were they at any time after Edgerton.* Therefore, the insurers cannot credibly argue that

---

[48] *See* Rachel A. Schneider, *City of Edgerton v. General Casualty: What's a Poor Insured to Do?* 2 Wis. Envtl. L.J. 275, 284 (1995). These provisions have almost universally been held to be clear and enforceable. *See* 1 Tod I. Zuckerman & Mark C. Raskoff, *Environmental Insurance Litigation: Law and Practice,* § 3:1 n.1, at 3–2 (1996 & Supp. 2002).

*Edgerton* established significant reliance interests, in terms of how insurance contracts have been drafted and bargained for, that will be harmed by its reversal.[49]

¶ 118. Finally, we do not share the insurers' dire prediction that overruling *Edgerton* will result in a dramatic increase in insurance coverage litigation and the unnecessary expenditure of litigation and judicial resources to address coverage issues that, the insurers allege, are now avoided. As discussed above, *Edgerton* itself has done everything *but* forestall litigation in this specific area of the law. In addition to the *Hills* case, numerous appellate decisions, both published and unpublished, and many circuit court actions have transpired since *Edgerton,* each attempting to resolve numerous coverage issues left unsettled by *Edgerton.* Moreover, other issues concerning coverage, even under

---

[49] To be sure, insurers and insureds may have assessed their respective expected costs and obligations in situations governed by *Edgerton* and have accounted accordingly. However, this ancillary reliance is not the type of conduct modification upon which the merit of stare decisis is predicated.

In addition, the fact that companies, including Johnson Controls, have purchased Environmental Impairment Liability (EIL) insurance polices to supplement their general liability policies is not an indication of reliance on the holdings of *Edgerton.* Rather, it shows that *insurers* have, since the issuance of the CGL policies at issue in this case, realized that the scope of former CGL policies included these response costs, that the insurers did not want to cover such costly property damages, and that they revised the CGL policies to expressly eliminate such coverage. Insureds simply and rationally responded to the resultant void in their coverage and purchased newly offered EIL policies to fill the gap created by the insurance companies' own attempts to preclude coverage of these liabilities. *See Olin Corp. v. Ins. Co. of N. Am.,* 221 F.3d 307, 325 (2d Cir. 2000).

the *Edgerton/Hills* scheme articulated by the court of appeals in *Johnson Controls I,* appear destined to arise if this court were to continue its strained attempt to reconcile *Edgerton* with *Hills.*

¶ 119. In sum, there are ample compelling reasons to overrule *Edgerton.* The applicable rules of law established by *Edgerton* are not settled, much less settled correctly. Therefore, the errors of *Edgerton,* catalogued earlier in this opinion and amplified by the preceding discussion, must be corrected by this court.

## V

¶ 120. A government-issued notice alleging an insured's liability for environmental response costs under CERCLA constitutes the commencement of a legal proceeding that, in the CERCLA context, is the functional equivalent of a suit. These administrative proceedings are adversarial in nature and substantially affect the interests of the insured with respect to its liability and obligations under CERCLA. We hold that Johnson Controls reasonably expected that its CGL insurers' duty to defend would begin after it received potentially responsible party letters and conveyed them to the insurers. We also conclude that costs incurred to clean up damaged property as a result of an insured's liability under CERCLA are sums that an insured is legally obligated to pay as damages and must be indemnified by Johnson Controls' insurers, unless coverage is excluded by other provisions in the policies.

¶ 121. In reaching these conclusions, we overrule *City of Edgerton v. General Casualty Co. of Wisconsin,* 184 Wis. 2d 750, 517 N.W.2d 463 (1994), and reject the too narrowly stated definition of damages in *Shorewood.*

135

¶ 122. Because we reach these conclusions, there is no need to wrestle with the competing policy arguments relating to categories three and four, as defined by the court of appeals. Without *Edgerton,* there is no category one situation; without a category one, there can be no categories three and four. In fact, the entire need for the four-category taxonomy developed by the court of appeals disappears and the consequential damage principles of *Hills* universally apply, irrespective of whether the insured commences remediation under its legal obligations prescribed under CERCLA or Wis. Stat. ch. 292, or whether a cost recovery action is brought by the DNR, the EPA, or any another party.

¶ 123. Although this court would like to end this action after more than 13 years of litigation, we must remand the cause for further proceedings consistent with this opinion. The insurers have retained defenses to coverage related to other exclusions in the policies and/or other disputed issues of fact. Under the present posture of this action, these issues are outside the scope of our present review and remain to be judicially determined.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 124. N. PATRICK CROOKS, J. *(concurring).* While I agree with the majority opinion, I write separately to express my regret over the length of time it took for the difficulties presented by the *Edgerton* decision to be resolved.

¶ 125. Six years ago this court's decisions in *General Cas. Co. of Wisconsin v. Hills,* 209 Wis. 2d 167, 561 N.W.2d 718 (1997), and *Wisconsin PSC v. Heritage Mut.*

*Ins. Co.,* 209 Wis. 2d 160, 561 N.W.2d 726 (1997), sought to limit the damage caused by the *Edgerton* decision, without explicitly overruling that case. *See* majority op., ¶ 17.

¶ 126. Our decisions in *Hills* and *Heritage* highlighted the proper focus courts should employ when determining cases like *Johnson Controls.* As correctly noted by the majority, the analysis should be on the interpretation of the insurance policy, and not on environmental law. *See* majority op., ¶ 31 n.16. The *Hills* opinion stated:

> In general, the interpretation of an insurance contract is controlled by principles of contract construction. *See, e.g., Kuhn v. Allstate Ins. Co.,* 193 Wis. 2d 50, 60, 532 N.W.2d 124 (1995); *Maas [v. Ziegler],* 172 Wis. 2d 70, 79, [492 N.W.2d 621 (1992)]. The primary objective in interpreting a contract is to ascertain and carry out the intentions of the parties. *See, e.g., Maas,* 172 Wis. 2d at 79; *Kremers-Urban Co. v. American Employers Ins. Co.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). "Of primary importance is that the language of an insurance policy should be interpreted to mean what a reasonable person in the position of the insured would have understood the words to mean." *Sprangers [v. Greatway Ins. Co.],* 182 Wis. 2d 521, 536, [514 N.W.2d 1 (1994)]; *accord, e.g., Kuhn,* 193 Wis. 2d at 60; *Kremers-Urban Co.,* 119 Wis. 2d at 735.

*Hills,* 209 Wis. 2d at 175.

¶ 127. It was also emphasized in *Hills* that: "It has long been the law of this state that the cost of repairing and restoring damaged property and water to its original condition is a proper measure of *compensatory* damages." *Id.* at 181. As noted by the majority at ¶ 57, several cases and authorities were cited in support of this statement. The *Edgerton* decision did not address these cases and authorities at all.

137

¶ 128. Although the lower courts made a valiant effort to apply our decisions in *Hills* and *Heritage,* two new categories were developed in order to determine whether various situations would or would not be covered by language in comprehensive general liability insurance policies. *See* majority op., ¶ 21.

¶ 129. Instead of limiting *Edgerton,* as we hoped would occur after *Hills* and *Heritage,* the court of appeals concluded that the two new categories were controlled by the rationale of *Edgerton. See* majority op., ¶ 24. According to the court of appeals:

> The third category presents a situation where the insured is responsible for at least part of the contamination of a site that it does not own, and *has* been directed by a government to remediate the site, but has not done so. The insured is sued by the government to recover money it spent to clean up the site.

*Johnson Controls v. Employers Ins. of Wausau,* 2002 WI App 30, ¶ 7, 250 Wis. 2d 319, 640 N.W.2d 205 (*Johnson Controls II*). The court of appeals also stated:

> The fourth category encompasses situations where the insured is responsible for at least part of the contamination of a site that it does not own, and has been directed by a government entity to remediate the site, but has not done so. The insured is sued by the site's owner or others also responsible for the contamination who cleaned up the site at the government's direction.

*Id.,* ¶ 8. The court of appeals, in finding no insurance coverage for scenarios covered by categories three and four, further stated:

> In categories three and four, unlike in two, a property owner is not seeking "legal damages" for injury

138

> to its property by one who has either caused or contributed to the pollution. Rather, the government and property owners forced by the government to clean up contamination allegedly caused by Johnson Controls are seeking what *Edgerton* noted was "equitable monetary relief," that is, recompense for monies spent in complying with the nation's environmental-protection laws—*money that would have been spent by Johnson Controls if it had complied with the government's cleanup directives.*

*Id.,* ¶ 9 (citing *Edgerton,* 184 Wis. 2d at 784).

¶ 130. This approach did not result in the limiting function that it was hoped would occur from application of *Hills* and *Heritage.* In retrospect, it seems quite clear that we should have overruled, not distinguished, *Edgerton* six years ago.[1]

¶ 131. As a result of this, the problems created by *Edgerton* were unfortunately allowed to continue unnecessarily for six more years after our decisions in *Hills* and *Heritage.*

¶ 132. For the reasons discussed, I respectfully concur.

¶ 133. JON P. WILCOX, J. *(dissenting).* I disagree with the majority opinion, which regretfully overturns

---

[1] In her concurring opinion in *Hills* Chief Justice Abrahamson noted her belief that "the majority opinion marks a significant step towards overruling *Shorewood,* upon which *Edgerton* relied . . . ." She further stated her desire to "embrace the inevitable now by expressly overruling *Shorewood* and thereby recognizing the limited application of the *Edgerton* decision on damages." She did not wish to see *Shorewood* and *Edgerton* "overturned in small measures by debatable judicial distinctions." *General Cas. Co. of Wisconsin v. Hills,* 209 Wis. 2d 167, 185–86, 561 N.W.2d 718 (1997) (Abrahamson, C.J., concurring).

this court's decision in *City of Edgerton v. General Casualty Company of Wisconsin,* 184 Wis. 2d 750, 617 N.W.2d 463 (1994), rendered nearly a decade ago, and relied upon both by courts and numerous private parties. Because the majority fails to seriously consider several factors that support adherence to the doctrine of stare decisis in this case, I respectfully dissent from the majority opinion.

¶ 134. This case originated in 1989. After the circuit court in the original action dismissed Johnson Controls' claims regarding insurance coverage in 1995, this case came before us on a bypass petition. After holding the petition in abeyance until our decision in *General Casualty Company of Wisconsin v. Hills,* 209 Wis. 2d 167, 561 N.W.2d 718 (1997), was rendered, this court, on June 10, 1997, unanimously denied Johnson Controls' petition, which made many of the same arguments presented now. Since the time *Edgerton* was decided, this court has been presented with numerous opportunities and requests to overturn the decision. Until today, this court has consistently refused to do so.

¶ 135. More importantly, nothing of legal consequence has changed since *Edgerton.* The insurance policy language before us has not changed. The applicable federal law, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), has not changed. This case does not present us with a wholly new set of facts. The only thing that has changed is the personnel of this court and this court's view as to the proper definitions of "damages" and "suit." Overruling an established body of cases in this context raises serious questions about whether the court is "implementing 'principles . . . founded in the law rather than in the proclivities of individuals.' " *Payne v. Tennessee,* 501 U.S. 808, 853 (1991) (Marshall, J., dissenting)

(citation omitted). "[S]*tare decisis* is important not merely because individuals rely on precedent to structure their commercial activity but because fidelity to precedent is part and parcel of a conception of the 'judiciary as a source of impersonal and reasoned judgments.'" *Id.* at 852 (Marshall, J., dissenting) (citation omitted).[1]

¶ 136. Although the majority opinion offers a lengthy presentation of the doctrine of stare decisis, by overruling an established body of Wisconsin law simply because it feels *Edgerton* was wrongly decided, the majority, in effect, fails to do justice to a doctrine that forms one of the foundational pillars of our judicial system.

¶ 137. Because *Edgerton* is well-established precedent in Wisconsin, the question is not who has the better argument regarding the applicable policy language, but "whether today's majority has come forward with the type of extraordinary showing that this [c]ourt has historically demanded before overruling one of its precedents." *Payne,* 501 U.S. at 848 (Marshall, J., dissenting).[2] Thus, rather than offering a fervent repudia-

---

[1] Wisconsin's stare decisis jurisprudence is akin to that of the federal courts. *See, e.g., Linville v. City of Janesville,* 174 Wis. 2d 571, 591–92, 497 N.W.2d 465 (Ct. App. 1993) ("[T]he principle that stare decisis is a substantial disincentive to change is applicable to any court.") (citing *Planned Parenthood of Southern Pa. v. Casey,* 505 U.S. 833 (1992); *State v. Stevens,* 181 Wis. 2d 410, 441–42, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring) (quoting *Akron v. Akron Ctr. for Reprod. Health, Inc.,* 462 U.S. 416, 420 (1983)).

[2] "Adhering to precedent 'is usually the wise policy, because in most matters, it is more important that the applicable rule of law be settled than it be settled right.'" *Payne v. Tennessee,* 501 U.S. 808, 827 (1991).

141

tion of the majority's rationale and rehashing an argument previously settled, I merely explain why the court should adhere to the doctrine of stare decisis in the matter before us.

¶ 138. "Stare decisis is the motto of courts of justice." *Ableman v. Booth,* 11 Wis. 498 (1859). Adherence to stare decisis is crucial because "[r]espect for precedent 'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " *State v. Outagamie County Bd. of Adjustment,* 244 Wis. 2d 613, 628 N.W.2d 376 (2001).

> Fidelity to precedent, the doctrine of *stare decisis* "stand by things decided", is fundamental to "a society governed by the rule of law." When legal standards "are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results."
>
> . . . .
>
> No change in the law is justified by "a change in the membership of the court or a case with more egregious facts."

*State v. Stevens,* 181 Wis. 2d 410, 441–42, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring).

¶ 139. In addition to the plain dictates of the doctrine, there are several overriding reliance factors present in this context that the majority opinion fails to address, which demand an adherence to stare decisis. Thus:

> We should accord weight to this continued acceptance of our earlier holding. *Stare decisis* has added force when the legislature, in the public sphere, and citizens,

142

in the private realm, have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations or require an extensive legislative response.

*Hilton v. South Carolina Pub. Rys. Comm'n,* 502 U.S. 197, 202 (1991).

¶ 140. Most, if not all, of these reliance factors are present in this case. First, the insurance industry is one of the most heavily regulated business sectors in the state. The legislature has, in the past, enacted specific legislation in response to our construction of policy language.[3] Considerations of stare decisis are stronger where the legislative prerogative to overturn our decisions is involved. *See Hilton,* 502 U.S. at 202 (Scalia, J., concurring) (" 'Considerations of *stare decisis* have special force [where] the legislative power is implicated, and Congress remains free to alter what we have done.' ") (internal citation omitted). Thus, adherence to stare decisis is especially appropriate because in Wisconsin, the legislature has the final say over regulation of the insurance industry and it could possibly act to change the rule of *Edgerton.*[4]

---

[3] *See, e.g.,* Wis. Stat. § 632.32(5)(f) (1995–96), permitting an insurer to add a clause to an automobile policy that prohibits "stacking" of policy benefits; *Blazekovic v. City of Milwaukee,* 2000 WI 41, ¶ 20, 234 Wis.2d 587, 610 N.W.2d 467 (noting Wis. Stat. § 632.32(5)(f) "validat[es]" such clauses to avoid the duplication of benefits permitted under prior case law"). *Cf.* Wis. Stat § 103.465 (1995–96), abrogating the judicial blue-pencil announced in *Fullerton Lumber Co. v. Torborg,* 270 Wis. 133, 70 N.W.2d 585 (1955).

[4] As the Supreme Court has said in a slightly different context: "Congress has the final say over regulation of interstate commerce and it can change the rule of *Bellas Hess* by simply saying so. We have long recognized that the doctrine of stare

¶ 141. Moreover, "[c]onsiderations in favor of *stare decisis* are at their acme in cases involving property and contract rights, where reliance interests are involved." *Payne,* 501 U.S. at 828.[5]

> [W]e have made it clear that this court, in general, would depart from *stare decisis* only where unintentional conduct was involved and then *only when there were compelling reasons for altering a court-made rule.* [We also recently] pointed out our reluctance to deviate from precedent where rules of contract or property were involved.

*Antoniewicz v. Reszcynski,* 70 Wis. 2d 836, 869, 236 N.W.2d 1 (1975) (emphasis in original) (internal citations and quotations omitted); *see also Gottlieb v. City of Milwaukee,* 33 Wis. 2d 408, 431, 147 N.W.2d 633 (1967) (accord).

¶ 142. The majority opinion attempts to avoid this consideration by characterizing the decision as one involving unintentional tort-like conduct. *See* majority op., ¶¶ 113–15. While this *may* be true insofar as the underlying conduct giving rise to the policy dispute is concerned, the majority decision today abrogates a rule regarding *contract interpretation.* The court alters the rights and expectations of parties to a contract; it does not merely create a new rule governing standards of behavior. The determination of whether to purchase

---

decisis has 'special force' where 'Congress remains free to alter what we have done.' " *Quill Corp. v. North Dakota,* 504 U.S 298, 320 (1992) (Scalia, J., concurring) (citation omitted).

[5] *See also Quill Corp.,* 504 U.S. at 320 ("Moreover, the demands of the doctrine are 'at their acme . . . where reliance interests are involved.' ") (citations omitted).

certain types of insurance coverage and the drafting of language within insurance policies certainly constitutes intentional conduct.

¶ 143. Further, stare decisis concerns are particularly strong where substantial reliance in the affected business community occurs. Thus, where a "rule . . . has become part of the basic framework of a sizeable industry[,] [t]he 'interest in stability and orderly development of the law' that undergirds the doctrine of *stare decisis* . . . counsels adherence to settled precedent." *Quill Corp. v. North Dakota,* 504 U.S. 298, 317 (1992) (internal citations omitted). There is no doubt that the insurance industry constitutes a "sizeable industry." Furthermore, the number of litigants who have been subjected to the *Edgerton* and *Hills* definition of "damages" and "suit" demonstrate that the *Edgerton* and *Hills* decisions have become part of the basic framework of the insurance industry.[6] *Edgerton* itself has

---

[6] *See, e.g., State v. Hydrite Chem. Co.,* 2002 WI App 222, 257 Wis. 2d 554, 652 N.W.2d 828; *Nor-Lake, Inc. v. Aetna Cas. & Sur. Co.,* 2000 WI App. 94, 234 Wis. 2d 526, 611 N.W.2d 471, *rev. denied,* 2000 WI 88, 237 Wis. 2d 253, 616 N.W.2d 115; *Amcast Indus. Corp. v. Affiliated FM Ins. Co.,* 221 Wis. 2d 145, 584 N.W.2d 218 (Ct. App. 1998), *rev. denied,* 221 Wis. 2d 654, 588 N.W.2d 631 (1998); *Hydrite Chem. Co. v. Aetna Cas. & Sur. Co.,* 220 Wis. 2d 26, 582 N.W.2d 423 (Ct. App. 1998), *rev. denied,* 220 Wis. 2d 363, 585 N.W.2d 156 (1998); *Robert E. Lee & Assoc., Inc. v. Peters,* 206 Wis. 2d 509, 557 N.W.2d 457 (Ct. App. 1996), *rev. denied,* 211 Wis. 2d 531, 568 N.W.2d 298 (1997); *Spic and Span, Inc., v. Cont't Cas. Co.,* 203 Wis. 2d 118, 552 N.W.2d 435 (Ct. App 1996), *rev. denied,* 211 Wis. 2d 530, 568 N.W.2d 297 (1997); *Sauk County v. Employers Ins. of Wausau,* 202 Wis. 2d 433, 550 N.W.2d 439 (Ct. App. 1996), *rev. denied,* 211 Wis. 2d 530, 568 N.W.2d 297 (1997); *Regent Ins. Co. v. City of Manitowoc,* 205

been cited 242 times since it was decided.[7] While obviously not all of these authorities agree with the *Edgerton* holding, the number of citations itself demonstrates how entrenched *Edgerton* has become in this area of the law. In addition to the large number of litigants subjected to the *Edgerton* and *Hills* rule of law, it is very probable that a substantial number of businesses, relying on *Edgerton,* refrained from litigating CERCLA related disputes with their insurers.

¶ 144. The majority asserts that "[m]ost, if not all, CGL polices executed today will not be governed by either this decision *or* by *Edgerton.*" Majority op., ¶ 117 (emphasis in majority). The majority then proceeds to argue that this fact supports their refusal to adhere to stare decisis. Regardless of the applicability of today's decision to current insurance policies, the fact remains that a substantial group of similarly situated insureds, with policy language identical to Johnson Controls' insurance policy, have been subjected to the *Edgerton* and *Hills* rule of law. Having determined in *Hills* that the principles of *Edgerton* were still controlling in the CERCLA context, and through our subsequent assurances of the validity of *Edgerton* by rejecting multiple requests to overturn *Edgerton* in the past, "we ought not visit economic hardship upon those who took us at our word." *Quill Corp.,* 504 U.S at 321 (Scalia, J., concurring) (citation omitted).

¶ 145. The practical effect of overruling *Edgerton* now, after nearly a decade of vitality, is to subject a

---

Wis. 2d 450, 556 N.W.2d 405 (Ct. App. 1996), *rev. denied,* 211 Wis. 2d 530, 568 N.W.2d 297 (1997). The majority concedes this point. *See* majority op., ¶ 118.

[7] This list includes 86 cases, one administrative decision, and numerous secondary sources, including several practice guides, specialty reporters, and insurance treatises.

group of similarly situated litigants to two different rules of law based merely upon the time they litigated their dispute. This result runs contrary to the basic principles of justice in a free society.[8]

¶ 146. Moreover, the fact that since *Edgerton,* insureds have purchased additional forms of insurance to cover pollution cleanup expenses demonstrates that there has been substantial reliance on *Edgerton* in the insurance community. The majority asserts that the change in policy language and development of new forms of coverage does not evidence reliance on *Edgerton,* but rather:

> shows that *insurers* have, since the issuance of the CGL policies at issue in this case, realized that the scope of former CGL polices included these response costs, that the insurers did not want to cover such costly property damages, and that they revised the CGL policies to expressly eliminate such coverage.

Majority op., ¶ 117 n.49.

¶ 147. However, after *Edgerton,* Wisconsin was among a distinct minority of jurisdictions that held that "damages" in CGL policies did not include CERCLA response costs. Thus, while the majority's rationale may hold true regarding the mass of jurisdictions adopting the contrary rule, it is more probable that in Wisconsin, other forms of pollution insurance were purchased specifically because this court found that a standard CGL policy did not cover these expenses.

¶ 148. Although the majority purports to be "mindful of the reliance interests of businesses . . . that have arisen due to this court's holding in *Edgerton*[,]"

---

[8] *See People v. Jones,* 350 N.E.2d 913, 915 (N.Y. 1976) (Breitel, C.J., dissenting) (citing Aristotle, *Ethica Nicomachea,* book V, ¶¶ 1129a, 1131a (Ross ed.)).

majority op., ¶ 116, it then proceeds to assert: "To be sure, insurers and insureds may have assessed their respective expected costs and obligations in situations governed by *Edgerton* and have accounted accordingly. However, this ancillary reliance is not the type of conduct modification upon which the merit of stare decisis is predicated." Majority op., ¶ 117 n.49.

¶ 149. Quite the contrary, one of the fundamental justifications for the rule of stare decisis is to provide a consistent predictable rule of law upon which society, particularly businesses, may properly order their affairs, i.e., engage in rational business decision-making, without the continuous ominous threat of the legal bases for those decisions being changed. *See, e.g., James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 551–52 (1991) (O'Connor, J., dissenting) ("At its core, *stare decisis* allows those affected by the law to order their affairs without fear that the established law upon which they rely will suddenly be pulled out from under them."); *Khan v. State Oil Co.,* 93 F.3d 1358, 1367 (7th Cir. 1996) (Ripple, J., concurring) ("[W]e ought to ensure, through strict application of the doctrine of stare decisis and precedent, that the law is sufficiently predictable and certain to permit businesses to order their affairs with a clear understanding of what the law requires."); *Smith v. Brennan,* 157 A.2d 497, 501 (N.J. 1960) ("Stare decisis . . . applies primarily to decisions . . . , which invite reliance and on the basis of which men order their affairs, e.g., in the field of contract or property rights.").

¶ 150. While the majority is correct when it notes that a standard CGL policy covers all known and unknown losses, majority op., ¶ 115, since *Edgerton* and *Hills,* insurers have rationally concluded that they have no liability for environmental response costs when

the costs are incurred as a result of administrative proceedings, as opposed to certain third party lawsuits. Thus, while their policies, in general, covered all known and unknown losses, after *Edgerton,* this court made known to insurers that certain categories of losses would not be covered. Regardless of whether insurers originally expected their CGL policies to cover CERCLA-like costs, what is important is that this court specifically told them in *Edgerton* that their policies did not cover these costs. The majority, by overturning *Edgerton* today, defeats those expectations, and frustrates the business decisions and predictions made in reliance on *Edgerton* and *Hills.* "The original risk assessment [made after *Edgerton*] becomes a nullity if the language of the policy is redefined in order to expand coverage beyond what was planned for by the insurer in the contract of insurance." *Edgerton,* 184 Wis. 2d at 779 n.26. As a result of today's decision, insurers are now at risk for liabilities they did not anticipate, and consequently, for which they did not collect premiums.

¶ 151. Finally, refusing to adhere to stare decisis in this case sends a precarious message to litigants suffering adversely from our decisions. The solidity of the judiciary depends upon non-prevailing litigants accepting our decisions and adjusting their behavior accordingly. By overturning established precedent today, after repeatedly refusing to do so in the past, the court tells litigants with the means to do so that they are better served through constant expostulations and challenges to adverse decisions than by acknowledging the validity of the state's law, even if reluctantly, and abiding by it. Now, due to its persistence and this court's newfound change of heart as to the validity of *Edgerton,* Johnson Controls has finally gotten its way.

¶ 152. Without adherence to stare decisis, "courts would not be making any 'law'; they would just be resolving the particular dispute before them." Antonin Scalia, "Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws", *in A Matter of Interpretation, Federal Courts and the Law* 3, 7 (1997). If the resolution of each dispute before this court is open to reassessment based merely on the perseverance of the litigants and the grace of the court, the foundation of an impartial judiciary crumbles, and our beacon of judicial light becomes an erratic reflection, with no discernible course.

¶ 153. The majority does offer some justifications for disregarding stare decisis. The majority first concludes that our decision in *Hills* undercuts and destroys the rationale of *Edgerton,* such that the two cannot be reconciled. Majority op., ¶¶ 102–05.[9] Interestingly, the *Hills* decision itself recognizes that the two decisions can co-exist on the same intellectual plane:

> [T]he nature of the relief being sought by Arrowhead is different than that sought by the DNR in *Edgerton*. **We therefore reject General Casualty's assertion that we must overrule *Edgerton* in order to hold that the suit in this case seeks "damages."** *Edgerton* continues to stand for the proposition that receipt of a letter from the EPA or DNR requesting a party to propose a remediation plan does not constitute a "suit seeking damages."

*Hills,* 209 Wis. 2d at 182 (emphasis added). Yet, despite this rationale, the majority asserts: "*Hills* did not conclude that the nature of the relief sought changes

---

[9] "[I]f we do not remove or limit the force of *Edgerton,* we must remove or limit the force of *Hills*." Majority op., ¶ 105.

based on the identity of the party bringing the action. The opinion merely concluded that the DNR and EPA, when parties in a CERCLA cost recovery action, are somehow different from other parties." Majority op., ¶ 107. The dispositive factor in *Hills* was not, as the majority suggests, the identity of the parties; rather, it was "*the type of relief sought and the posture of the party seeking relief* ." *Amcast Indus. Corp. v. Affiliated FM Ins. Co.,* 221 Wis.2d 145, 160, 584 N.W.2d 218 (Ct. App. 1998) (emphasis in original).

¶ 154. In fact, *Hills* relied on the definition of "damages" adopted by *Shorewood* and *Edgerton:* "Thus, under the definition set forth and applied in *Shorewood* and *Edgerton,* Arrowhead is seeking 'damages' from Hills as that word is used in the insurance policies at issue." *Hills,* 209 Wis. 2d at 181. Then applying this same definition, *Hills* concluded that while the governmental action in *Edgerton* did not fall within this definition of damages, the action before it did. *Id.* at 180–81. Therefore, the difference in result between *Edgerton* and *Hills* is not one based on logically inconsistent rationales, but rather a factual distinction based upon the same underlying reasoning. *Id.*

¶ 155. The majority identifies its own inconsistency because it focuses on the nature of the derivative conduct giving rise to CERCLA liability and the results in each case, rather than on the nature of the action for which the insured seeks policy coverage. The distinction between *Edgerton* and *Hills* is not, as the majority asserts, based on "the fortuity of whether the insured had ever been contacted in some manner by the government." Majority op., ¶ 62. Rather, this distinction centers on *Hills'* conclusion that the type of relief sought by a third party is different than the type of

relief sought by the government in CERCLA proceedings. *Hills*, 209 Wis. 2d at 182.

¶ 156. There is only conflict between *Edgerton* and *Hills* because the majority has eviscerated the underlying rationale of *Edgerton* and then focused on the result reached in both cases. Although *Edgerton* appears inconsistent with *Hills* if one adopts the majority's view of "damages" in the CERCLA context, that is not the point. The point is that *Edgerton* and *Hills* were consistent under the rationale employed by the court when those decisions were rendered. In essence, the majority disagrees with *Edgerton's* logic, concludes it has the better argument, and then judges the continued co-existence of the two cases by retrospectively applying its new paradigm to them. This is not a justifiable basis for refusing to adhere to precedent.

¶ 157. To further widen the artificial intellectual chasm between *Edgerton* and *Hills*, the majority points to the fact that the *Edgerton* court did not take into account the reasonable expectations of the insured, while the *Hills* court did. Majority op., ¶ 104. However, taking into account the reasonable expectations of the insured when construing the language of an insurance policy does not ipso facto mean construing the policy to bear a pro-insured result.

> In the case of an insurance contract, the words are to be construed in accordance with the principle that the test is ... what a reasonable person in the position of the insured would have understood the words to mean. Whatever ambiguity exists in a contract of insurance is resolved in favor of the insured. ...
>
> ... However, when the terms of the policy are unambiguous and plain on their face, the policy should not be

rewritten to include insurance coverage not agreed to
by the parties and for which it was not paid.

*Sch. Dist. of Shorewood v. Wausau Ins. Cos.,* 170 Wis.
2d 347, 367, 488 N.W.2d 82 (1992) (internal citations
omitted).

¶ 158. The court in *Shorewood,* having deter-
mined that " '[d]amages' as used in these insurance
policies unambiguously means legal damages[,]" *id.* at
368, the *Edgerton* court in construing the same phrase
was not required to discern the reasonable expectation
of the insured, as the precise language they were
interpreting had already been determined to be unam-
biguous. *Edgerton* itself recognized this: "[A]n
insured's expectations may not be satisfied in contra-
diction to policy language which clearly identifies the
scope of the insured's coverage." *Edgerton,* 184 Wis. 2d
at 780. The mere fact that the context of *Edgerton* was
different than the factual context of *Shorewood* does
not justify a reinterpretation of that phrase:

> [A]ppellate courts are not bound to reexamine a deter-
> mination of a phrase in an insurance policy with each
> differing fact situation. . . . When difficulty comes in
> applying the plain meaning of the phrase to a particular
> fact situation, an otherwise unambiguous provision is
> not made ambiguous simply because it is difficult to
> apply to the facts of a particular case.

*Quinlan v. Coombs,* 105 Wis. 2d 330, 334–35, 314
N.W.2d 125 (Ct. App. 1981). Thus, the fact that a rule or
interpretation may generate hard questions in the

153

future, *see* majority op., ¶ 109, is not a reason to abandon that rule once it has been firmly rooted in this state's jurisprudence.[10]

¶ 159. The majority next suggests that stare decisis need not be followed in this case because *Edgerton* has failed to provide "suitable direction and consistency to this area of the law." Majority op., ¶ 106. However, the majority's determination that a PRP letter is a "functional equivalent" of a "suit" such that "insurers have a duty to defend an insured who receives a PRP letter from the EPA or an equivalent state agency seeking remediation or remediation costs . . . [,]" majority op., ¶ 92, while purporting to establish a bright line rule, fails to adequately rationalize under what circumstances a PRP letter will trigger a duty to defend.

¶ 160. Not all PRP letters contain a demand for pecuniary remuneration. *Edgerton,* 184 Wis. 2d at 775 (noting that the letters from the EPA and DNR in that case merely sought information and asked for voluntary compliance). Are *all* PRP letters to be considered a "suit"? If a recipient of a PRP letter merely provides information, or does act voluntarily, what is there to defend against? What precise language in a PRP letter is necessary to assume a sufficient adversarial posture? Must an insurer provide a "defense" simply because a PRP letter has been received by an insured, without any regard to the contents, tenor, or requests contained therein? What, if any, circumstances would permit an insurer to refuse to defend, once a PRP letter has been received by an insured, without being liable for bad

---

[10] "[It is important] that we retain our ability— [and] . . . public confidence in our ability—sometimes to adopt new principles for the resolution of new issues without abandoning clear holdings of the past that those principles contradict." *Quill Corp.,* 504 U.S at 320–21 (citation omitted).

faith breach of contract?[11] A rule that leaves unanswered so many significant questions can hardly be characterized as promoting consistent and logical results.

¶ 161. Conversely, *Edgerton did* provide suitable direction and consistency in this regard: " 'Suit' denotes court proceedings, not a 'functional equivalent.' . . . Either there is a suit or there is not. When there is no suit, there is no duty to defend." *Edgerton,* 184 Wis. 2d at 781. This was a clear, workable rule, based upon an unambiguous legal definition, which has produced consistent results. Furthermore, this previous construction of "suit" was based on a commonsense, everyday understanding of the term. Johnson Controls

---

[11] The willingness of many courts to give an expansive interpretation to "suit" has presented practical difficulties in applying traditional rules that have governed the duty to defend in such states.

The mere fact that a PRP letter may be deemed to be a "suit" does not automatically require an insurer to defend. As with actual lawsuits, the allegations set forth in these claims must be compared against the insurer's policy to determine whether there is any potential for coverage.

Unfortunately, the determination of whether a PRP letter triggers a duty to defend is made more difficult by the fact that such notices rarely contain substantive factual allegations and are typically silent as to when or how pollution occurred. Although a growing number of states permit the consideration of extrinsic facts, both to create and to refute a duty to defend, many states continue to adhere to the traditional view that an insurer may not look beyond the "four corners" of the underlying complaint in considering whether it has a duty to defend.

David L. Leitner et al., Law and Practice of Insurance Coverage Litigation § 44.3, *The Duty to Defend Pollution Claims* (2001).

did not contract to be defended when it faced the "functional equivalent of a suit"; it contracted to be defended from "suits."

¶ 162. In sum, I dissent because the majority failed to consider several important reliance interests that further buttress adherence to stare decisis in this context. Further, I do not find any of the majority's reasons for departing from stare decisis in this case to be persuasive. Finally, regardless of who has the better argument as to the meaning of "damages" in a CGL policy in the context of CERCLA, I do not believe that *Edgerton* and *Hills* were based upon fundamentally different rationales, such that their continued co-existence is impossible to reconcile.

¶ 163. For these reasons, I am of the opinion that there is no need or justification to overrule *Edgerton* today; therefore, I am compelled to dissent.

¶ 164. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.